In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-3281

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

GREGORY WOLFE,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 2:10-cr-00207-RL-PRC-2—**Rudy Lozano,** *Judge.*

ARGUED SEPTEMBER 19, 2012—DECIDED DECEMBER 5, 2012

Before BAUER, KANNE, and WOOD, *Circuit Judges*.

BAUER, *Circuit Judge.* Gregory Wolfe was convicted on one count of bank theft and one count of interstate transportation of stolen goods under 18 U.S.C. §§ 2113(b) and 2314 for his role in a copper theft scheme. The district court sentenced Wolfe to eighty-eight months' imprisonment on each count, to be served concurrently, followed by concurrent three-year terms of supervised release. The district judge also ordered restitution in the

amount of $3,028,011.29. Wolfe appeals, contending that he was deprived of a fair trial because of statements the prosecutor made during closing argument. Wolfe also challenges the sentence he received and the restitution order imposed. Finding that Wolfe's contentions lack merit, we affirm.

## I.  BACKGROUND

Wolfe began working at Katoen Natie ("KTN") in May 2008. KTN is an international company involved in the packaging and storing of plastics and various commodities, including aluminum and copper. It has U.S. warehouses in Gary, Indiana; Texas; New Jersey; Louisiana; and California. Wolfe worked at the Gary warehouse where his stepfather, Gregory Harris, was the operations manager. Wolfe was hired in 2008 as a forklift operator but was later given more of a supervisory role.

In late 2008 to early 2009, KTN began storing copper for Henry Bath, LLC, at the Gary warehouse. Henry Bath's copper arrived at the warehouse in bundles of approximately sixteen to twenty-six copper sheets. Each copper sheet was approximately three feet long by three feet wide and weighed roughly 330 pounds, and the top sheet of every bundle had a sticker identifying which lot it was from. The copper is traded on the London Metal Exchange ("LME") by the warrant; one warrant is equal to ten bundles. The weight of each bundle is an important component of the trading process, so LME regulations require each bundle to be secured by two bands at all times.

Shortly after KTN began storing copper for Henry Bath, Harris became the facilities manager, which put him in charge of the entire Gary warehouse, and Wolfe became the point of contact for the Henry Bath account. In 2009, Wolfe had an in-depth conversation with Kenneth England, manager of Henry Bath's U.S. operations, about the protocol for banding the copper bundles. England informed Wolfe that it was KTN's responsibility to make sure that any bands that had become severed during the copper's transportation to the Gary warehouse were immediately repaired. He emphasized to Wolfe the importance of each bundle being secured by two bands at all times, as per LME regulations, in order to prevent copper from being stolen from a bundle. England also told Wolfe that KTN was not to move any copper in the Gary warehouse from the location where it was originally placed—known as the "place of rest"—unless it was being shipped out or moved to save space within the warehouse.

Wolfe was also told that, before any copper shipment could occur, Henry Bath was required to inform KTN about the particular items that would be removed from the warehouse and loaded onto a truck. And once a truck was loaded but before it left the warehouse, Henry Bath was to create a receipt—the "bill of lading"—that would be given to the truck driver. Wolfe was also on notice that Henry Bath would only generate a bill of lading during its normal business hours of 8:00 a.m. to 4:30 p.m. EST. These copper-shipping procedures were reiterated to Wolfe during a seminar at Henry Bath's Baltimore, Maryland, headquarters in January 2010.

The first copper shipments out of the Gary warehouse occurred in December 2009. Harris instructed Wolfe, who in turn called and directed Craig Olds and Jose Morales (lower-level employees at KTN who performed tasks at Wolfe's direction), to arrive at the warehouse at 3:00 a.m. When Wolfe, Olds, and Morales were at the warehouse, two trucks arrived, and the three employees loaded certain copper bundles onto the trucks. The trucks then left the warehouse. Wolfe testified at trial that he participated in two copper shipments like this during December 2009.

During the summer of 2010, Wolfe asked at least five KTN employees—regular employees (Olds, Morales, and Noel Santos) and temporary help (Julio Virtes and Robert Martinez)—whether they would be willing to assist with copper re-bundling.[1] Wolfe told the individuals that the copper bundles contained too many sheets, and they should take the top piece off, remove the next sheet or sheets from the stack, and then put the top piece back on the stack. This resulted in the creation of entirely new copper bundles. The initial plan was to re-

---

[1] Olds was the first KTN employee to assist Wolfe with this re-bundling process. Harris asked Olds if he would be willing to work overtime, to which Olds said yes, and then instructed him to speak to Wolfe. Olds assisted Wolfe at 3:00 a.m. on the next Saturday morning for roughly twelve hours and the next Sunday morning beginning around 3:00 a.m. to 6:00 a.m. The two men were able to create roughly five new bundles of copper that weekend.

band the original bundles, but when that proved too difficult, the KTN employees simply left the bundles with broken bands. The new bundles were moved to the back of the warehouse, away from the original copper bundles.[2]

The KTN employees referred to the copper re-bundling as "G-Money's Project," "G-Money" being Wolfe's nick-name. Regardless of which employees were assisting at the time, some employees removed copper sheets from the bundles while others were responsible for moving the newly-formed bundles to a different location. Wolfe maintained a piece of paper with file num-bers—jokingly referred to as Wolfe's "little black book"—that he used to keep track of which copper bundles had sheets removed from them. The "project" was never completed during normal KTN business hours; employees either arrived early or stayed late on weekdays or completed the work on week-ends. Wolfe told employees who asked him about the copper re-bundling that they were "fixing a problem for the customer to keep the customer happy" or "not to ask questions."

---

[2] The original copper bundles were banded with a "manufac-turing band." These bands were marked with the initials of the company factory where the bundles were made. The bands on the newly-formed bundles often did not have any manufac-turer marks. Wolfe explained this difference by stating that the forklift used to move bundles often caused the bands to break, so they had to re-band the bundles with new bands.

Michael Cohen, who purchased the copper directly from Harris on behalf of his business, Team Alliance Plastics, sent trucks to the Gary warehouse to pick up the copper. The trucks typically arrived at the Gary warehouse between 3:00 a.m. and 4:00 a.m. to receive the copper loads. Eron Titsworth, a truck driver for Team Alliance Plastics, testified that he had a difficult time getting through KTN's security gates on one occasion, but after calling Harris, Morales arrived at the gate in less than two minutes, and he never again had trouble with security. Once the trucks were past security, Olds and Morales loaded the trucks in conformance with the instructions they had received from Wolfe regarding which copper bundles to load. The truck drivers never received any paperwork from KTN in connection with the copper pickups; they created their own bills of lading in case they were stopped by law enforcement personnel.

After the copper bundles were loaded onto the trucks, the truck drivers transported them from the Gary warehouse to the Team Alliance Plastics warehouse in Springfield, Michigan. Upon receipt of the copper shipments, Cohen would remove the bands and return them to Harris. The copper was then repackaged and sold to Stiana, a company located in Toronto, Canada. Cohen received approximately $500,000 from Stiana for the copper; he paid Harris approximately $360,000. Cohen testified that he purchased roughly eleven to fourteen trucks' worth of copper between the first shipment of copper in December 2009 and the last shipment in September 2010.

In late August 2010, Henry Bath conducted a random audit of the copper at the Gary warehouse. The auditors discovered that the weight of certain warrants was too light. Harris was notified of the discrepancies and informed that the auditors would return in a few days to reweigh all of the copper stored in the Gary warehouse.

When the Henry Bath employees returned to the Gary warehouse in September 2010, they discovered that many of the copper bundles had broken bands and were missing at least one sheet of copper. They also noticed that seven complete warrants of copper that had been at the warehouse during the August 2010 audit were now missing. Approximately $2,900,000 worth of copper—390 metric tons—was missing.[3] A review of Henry Bath's records revealed that no copper left the Gary warehouse legitimately between August 2009 and September 2010. Two days after Henry Bath learned of the missing copper, Harris failed to show up for work; instead, he sent Frank Vingerhoets, the president of KTN, a text message saying he believed he would be fired.

Wolfe was told that day to leave the Gary warehouse premises, and Harris and Wolfe were fired.

On November 18, 2010, a Grand Jury returned a two-count indictment against Wolfe and Harris for violating 18 U.S.C. §§ 2113(b) and 2314—bank theft and interstate

---

[3] This was a relatively small percentage of the 12,000 metric tons of copper that were stored in the Gary warehouse.

transportation of stolen goods.[4] A four-day jury trial was later held for Wolfe.

During the trial, Wolfe claimed he had no knowledge of the copper theft scheme; he was simply following Harris' orders and directions. To rebut this defense, the Government offered the testimony of Ashby Gurgon, Wolfe's on-and-off girlfriend. Gurgon described Harris and Wolfe as living extravagantly during the summer of 2010. Gurgon, Wolfe, Harris, and Harris' mistress (Shantel Cottew) frequented bars and clubs in Chicago and spent the night at the Peninsula Hotel. They flew first class on trips to Puerto Rico and Las Vegas, and rode in limousines and party buses. Harris, whose salary was approximately $70,000, paid for everything. Examples of his expenses during the summer of 2010 include the following: $800 in one night for Jäger bomb shots;[5] $10,000 a month for his mistress' rent in Ogden Dunes, Indiana; $2,000 for Gurgon to play a dice game; $2,000 for Gurgon's mortgage; $14,800 (in $100 bills) for a down payment on a 2010 Chevrolet Tahoe; $18,000 for a 2007 Ford Mustang; and "thousands of dollars" for Wolfe's sister Deanna's wedding.

---

[4] At some point in time, JPMorgan Chase purchased Henry Bath and, therefore, was the owner of the copper stolen during the scheme. As discussed at oral argument, this is the reason for the "bank theft" count.

[5] A Jäger bomb is a cocktail made by dropping a shot (1.5 ounces) of the alcoholic beverage Jägermeister into a pint glass containing half a can of the caffeinated energy drink Red Bull.

Gurgon also described what she knew about "the business."[6] She said Wolfe told her that Harris was the leader and he was a partner, though he was later demoted and called a "soldier" for messing up. When discussing the time period after the first audit, Gurgon said that Wolfe began working "really hard" during the midnight hours. She then described how, after a night out drinking, Wolfe told her that Henry Bath would find out what was missing and that he could get in a lot of trouble. Gurgon testified that Wolfe described the plan for Harris to take all the blame and to "go big or go home" before the second audit. Additionally, Gurgon said that, after Wolfe was suspended from his job with KTN, he spoke to her about his meeting with a lawyer and having nothing to worry about because he was not in charge of the operation. For Wolfe's role in the business, Gurgon said that Harris agreed to match whatever payment Wolfe received from KTN.[7] Gurgon also said that Wolfe, Harris, and Nick Chorak—another KTN employee at the Gary warehouse—were the only people who received direct compensation from the copper theft.

---

[6] Gurgon testified that Wolfe, Harris, and Harris' mistress referred to whatever scheme or illegitimate work they were involved in at the Gary warehouse as "the business."

[7] Harris paid Wolfe approximately $310 to $350 per week in addition to Wolfe's KTN paycheck. Wolfe claimed Harris offered to pay him this amount in order to entice him to work at the Gary warehouse, despite the low hourly wage, after graduating from high school in 2008.

The Government also played a surveillance video from the Gary warehouse taken on August 23, 2010, at approximately 3:45 a.m. The video showed two trucks being loaded and an individual walking along the edge of the loading dock. Four witnesses for the Government testified that Wolfe was more than likely the man in the video; one Government witness said he could not identify the man. Wolfe was unable to tell whether he was the disputed man in the video, stating, "I— I don't know. I don't know if it was me. I can't make a—I don't know." This was a central issue because Wolfe did not punch in until 4:00 a.m.[8] Additionally, the video did not show any copper in the trucks; it only showed dunnage in the back.[9]

During closing argument, the Government lawyer argued that Wolfe was a knowing participant of the scheme from the beginning and his testimony was not to be trusted. The prosecutor supported this contention by highlighting the fact that Wolfe would not even identify himself on the video.

---

[8] KTN maintained a timekeeping system to record its employee's arrival and departure times at the Gary warehouse. Some employees, including Wolfe, were required to punch in; Harris was not.

[9] Wolfe also instructed Olds and Morales to load dunnage—i.e., waste-like cardboard, broken bands, or old pallets—onto the trucks and around the copper bundles to keep the bundles from moving during transport. Olds and Morales thought this was out of the ordinary given the weight of the bundles.

The jury convicted Wolfe on both counts.

At Wolfe's sentencing hearing on September 29, 2011, the district court accepted the Presentence Investigation Report ("PSR") over Wolfe's objection and sentenced Wolfe to eighty-eight months' imprisonment on each count, to be served concurrently, followed by concurrent three-year terms of supervised release. Restitution in the amount of $3,028,011.29 was also imposed.

## II. DISCUSSION

Wolfe challenges statements made by the prosecutor during his closing argument, the district court's determination of the victim loss amount attributed to him, and the district court's restitution order. We address each challenge in turn.

### A. Closing Argument

Wolfe claims two categories of improper remarks during the Government's closing argument denied him a fair trial: (1) credibility-vouching for the Government's witness, Gurgon; and (2) misstating trial testimony. These statements were not objected to at trial, so our review is limited to plain error.

A review of comments by a prosecutor involves a two-part inquiry. First, we consider whether the challenged remark was improper, and second, whether the remark deprived the defendant of a fair trial. *United States v. Lathrop*, 634 F.3d 931, 939 (7th Cir. 2011). We

consider five factors to determine whether the remarks prejudiced the defendant: "(1) the nature and seriousness of the misconduct; (2) the extent to which the comments were invited by the defense; (3) the extent to which any prejudice was ameliorated by the court's instruction to the jury; (4) the defense's opportunity to counter any prejudice; and (5) the weight of the evidence supporting the conviction." *United States v. Adams*, 628 F.3d 407, 418-19 (7th Cir. 2010). The plain error review requires Wolfe to demonstrate that the trial's outcome would have been different absent the prosecutor's remarks. Wolfe faces an uphill battle in making this challenge as improper statements during closing argument rarely constitute reversible error. *United States v. Nunez*, 532 F.3d 645, 654 (7th Cir. 2008); *United States v. Anderson*, 303 F.3d 847, 854 (7th Cir. 2002).

### 1.  Credibility Vouching Comments

We have recognized two types of impermissible vouching: "a prosecutor may not express her personal belief in the truthfulness of a witness, and a prosecutor may not imply that facts not before the jury lend a witness credibility." *United States v. Alviar*, 573 F.3d 526, 542 (7th Cir. 2009). A prosecutor may, however, comment on a witness' credibility as long as "the comment reflects reasonable inferences from the evidence adduced at trial rather than personal opinion." *Nunez*, 532 F.3d at 654 (quotations omitted). Wolfe identifies three examples of improper vouching, which we now consider.

Wolfe's first challenge is to the following remark:

> *I think* [Ms. Gurgon] was—and *I think you would agree with me, hopefully you'll agree with me,* one of the clearest, sharpest witnesses on trial. Obviously she's a very bright person. (emphasis added).

The Government acknowledges that vouching occurs when a prosecutor expresses his own personal belief regarding a witness' credibility. That is exactly what we have here. In fact, it is telling that the Government never even mentions in its brief the first part of the quote; it only mentions the "one of the clearest, sharpest witnesses on trial" portion. But we still must consider whether the improper statement affected the fairness of the trial overall, and if so, whether the outcome would have been different but for the remark.

We believe that, at worst, the prosecutor's comment that he hopes the jury will agree with his assessment of Gurgon's testimony was "borderline" inappropriate. *See United States v. McMath*, 559 F.3d 657, 667 (7th Cir. 2009) (concluding that the prosecutor's comment that the police officers were "'really credible,' while technically improper vouching, also seem[ed] fairly innocuous in context."). Here, the prosecutor immediately followed his comment with a reference to Gurgon's trial testimony: "On cross examination, when [defense counsel] asked her about the double life, she actually said, you know, it wasn't just a double life; it was a triple life. It was the life with me, the life with Ms. Yaw and then his life at the warehouse." Gurgon also testified at length and in detail about the summer of 2010 with

Wolfe and Harris, in addition to what Wolfe told her about the business. In short, the prosecutor should not have injected his own personal beliefs into the trial, but the evidence supported his characterization and this misstep in the context of the entire case does not support a finding that Wolfe was denied a fair trial. A full discussion of the relevant factors for prejudice is unnecessary.

Wolfe's next challenge is to the following statement in which the prosecutor characterized Gurgon as an innocent bystander of the scheme whose testimony should be given more weight:

> And unlike Mr. Morales, and unlike Craig Olds, and unlike Noel Santos, Ms. Gurgon has no reason to shade the truth in this case or to shade her testimony. She doesn't have to worry about getting charged with anything. She was working—she wasn't working at KTN. She wasn't involved in this.

Wolfe contends these statements were improper because the Government was implying that it had independently investigated Gurgon's role in the copper theft and cleared her of any wrongdoing, neither of which was a fact in evidence, and we agree. The evidence presented at trial does not support an inference that Gurgon was entirely guilt-free because she did not work at KTN—e.g., testimony demonstrated that she benefitted from the crime's financial fruits—but again, this does not end the inquiry.

All of the relevant factors except factor number two tip the scale in favor of a finding that Wolfe was not prejudiced by the remark. Credibility was a focus of the

trial, but whether Gurgon was criminally involved in the scheme did not make her testimony any more or less believable because she was not testifying pursuant to any agreement with the Government. She had no extra incentive to testify a certain way. *See United States v. Clarke*, 227 F.3d 874, 885 (7th Cir. 2000) (describing how both sides may argue the competing inferences resulting from a witness testifying pursuant to a plea agreement). The prosecutor's comments were neither serious nor substantial mistakes.

Moreover, Wolfe had an opportunity to respond to the remark during his closing argument (the Government did not reference it during its rebuttal), and the district court instructed the jury before and after closing arguments that the attorneys' statements were not to be taken as evidence. (There was no instruction immediately following the remark because Wolfe did not contemporaneously object at trial.)

Lastly, the evidence supporting the conviction was more than sufficient. Gurgon's testimony was no doubt important, but the testimony of the other witnesses—namely, Olds and Morales—firmly establishes Wolfe's knowledge of and participation in the scheme. They both described taking orders from Wolfe and being told not to question him about the copper. Morales additionally described Wolfe as indicating a guilty conscience once KTN began to investigate the missing copper, testifying that Wolfe said, "We're screwed," and, "[W]e need to get our stories together and make sure we are doing the same thing, that we were doing our jobs."

In short, we are not persuaded that Wolfe was prejudiced by the remark, even when considered with the first challenged statement.

Wolfe's third challenge is to the Government's description of Gurgon's memory:

> And you heard [Gurgon] say she's got no hard feelings against the defendant despite what happened in their relationship. Her kids still ask about him. She obviously has a memory for detail.

These remarks lack any indicia of impermissibility, as the prosecutor made them shortly after his description of Gurgon's testimony explaining Wolfe's triple life (discussed above). That "triple life" comment alone was sufficient to support the inference that Gurgon had a memory for detail. *See Nunez*, 532 F.3d at 654. Wolfe nevertheless directs our attention to *United States v. Francis*, 170 F.3d 546 (6th Cir. 1999), to avoid this conclusion. *Id.* at 552 (concluding that the prosecutor's comments about the defendant's credibility were impermissible because the prosecutor did not provide evidentiary examples supporting the inference). He contends the sentence about Gurgon's kids does not support the "more general, powerful statement" that Gurgon has a memory for detail. We do not read the rule regarding the use of trial evidence to support a closing argument characterization as requiring an attorney to make "bookend" comments. An inference made during closing argument need not always be introduced, nor immediately followed, by a direct reference to the trial record. *See Soltys v. Costello*, 520 F.3d 737, 745 (7th Cir. 2008) ("At-

torneys have more leeway in closing arguments to suggest inferences based on the evidence, highlight weaknesses in the opponent's case, and emphasize the strengths in their own case."). References to evidence supporting an inference are sufficient if they are made contemporaneously; that occurred here.

### 2.  Trial Testimony Comments

Misstatement of evidence may be improper prosecutorial conduct. *See United States v. Badger*, 983 F.2d 1443, 1450-51 (7th Cir. 1993). When discussing the video at trial and why Wolfe would not admit he is in the video, the prosecution explained that "*all* the other witnesses" identified the man on the video as Wolfe. Wolfe correctly points out this was a misstatement of the evidence: Titsworth, a truck driver who transported the stolen copper on a few occasions, testified that he could not positively identify the man at issue in the video. The Government argues in response that it did not misstate the evidence because, "[n]otwithstanding Titsworth, every government witness who could identify the first individual shown in the video testified that it was Wolfe." We interpret this clarification as a concession that the prosecutor's remark was indeed a misstatement of the evidence.

Again, however, Wolfe is unable to demonstrate that he was prejudiced by the prosecutor's remark. The only witness familiar with Wolfe's appearance who could not conclusively identify Wolfe in the video was Wolfe himself. The four Government witnesses who identified

Wolfe in the video were his boss (Vingerhoets), his co-workers (Olds and Morales), and his girlfriend (Gurgon)—i.e., the four Government witnesses who knew Wolfe well. It is not all that surprising that Titsworth, who testified that he had only met Wolfe on one prior occasion and incorrectly thought Wolfe's first name was Justin, could not identify who was in the video. The Government did not take a "No" and turn it into a "Yes;" it merely failed to mention the unfamiliar witness who could not identify the man in the video. Even Wolfe's counsel conceded in his closing argument, "And it probably is him [in the video]." We do not believe that the remark justifies a new trial.

## B.  Victim Loss Amount

The district court found the victim loss amount attributable to Wolfe to be $2,947,348. U.S.S.G § 2B1.1(b)(1)(J) calls for an 18-level increase if the victim loss is between $2,500,000 and $7,000,000, so Wolfe's offense level calculation was increased 18 levels. Wolfe claims the victim loss calculation was improper because, he says, the evidence did not support a calculation above $2,500,000. Therefore, his offense level should have been 2 levels lower. Specifically, Wolfe contends that he was unaware of the copper theft in 2009, that the value of the copper stolen in 2010 is likely $2,500,000 or less, and that he only loaded four trucks. We review the challenged victim loss calculation for clear error. *United States v. Reese*, 666 F.3d 1007, 1021 (7th Cir. 2012).

The Government called Olds as a witness at the sentencing hearing. Olds testified that during the 2010 summer, copper was loaded, at a minimum, on fifteen to eighteen trucks.[10] Each truck was believed to transport seven bundles of copper, with each bundle weighing approximately 6,500 pounds.[11] Based on these numbers, approximately 370 metric tons of copper were stolen from the KTN warehouse during the 2010 summer. The district court found this testimony credible, as well as the testimony that all of the truck loading was done at Wolfe's direction. Wolfe contends this was improper because: (1) Olds' testimony was contested (other testimony could be interpreted to show 40 metric tons was stolen in 2009 and Olds said the total number of metric tons stolen during the 2010 summer was 390); (2) the district court relied on information from Harris (who even the Government acknowledged was not credible); (3) and the district court failed to consider Wolfe's interpretation of the record.

We decline to disturb the district court's credibility determinations in this matter. *See United States v. Smith*, 576 F.3d 681, 687 (7th Cir. 2009) ("[W]e do not 'second-guess the trial judge's credibility determinations.'" (quoting *United States v. French*, 291 F.3d 945, 951 (7th Cir. 2002))).

---

[10] Olds described one additional occasion when Wolfe and Harris personally loaded three trucks, but he could not see what they were loading onto the trucks.

[11] Six thousand five hundred pounds is equal to approximately 2.948 metric tons.

Furthermore, it did not matter how many trucks Wolfe personally loaded. Section 1B1.3(a)(1)(B) provides that a defendant is accountable for others' conduct that is in furtherance of the criminal activity and reasonably foreseeable. *See United States v. Sheneman*, 682 F.3d 623, 631 (7th Cir. 2012). And regardless of how much copper was stolen in December 2009, the district court determined Wolfe was a knowing participant from the outset. The evidence was sufficient to support a conclusion that $2,947,348 of copper (391.941 metric tons) was stolen during the entire copper theft scheme and Wolfe was a knowing participant from the beginning. The losses were reasonably foreseeable to Wolfe, and the district court acted reasonably when it accepted the PSR's victim loss calculation.

### C. Restitution

The district court imposed a restitution order totaling $3,028,011.29. Wolfe challenges this amount on the ground that it was not supported by the jury's factual findings, a violation of the Sixth Amendment under *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Specifically, he contends that the recent Supreme Court decision in *Southern Union Co. v. United States*, ___ U.S. ___, 132 S. Ct. 2344 (2012), first, requires us to overturn our long-standing jurisprudence that restitution is not a criminal penalty, and second, mandates that all restitution amounts be supported by the jury's verdict.

A discussion of the rule of *Apprendi* and the *Southern Union* decision is necessary to give context to Wolfe's

claims. *Apprendi* stands for the proposition that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490. "Statutory maximum" has been defined as "the maximum sentence a judge can impose without additional jury findings." *United States v. Seymour*, 519 F.3d 700, 709 (7th Cir. 2008) (citing *Blakely v. Washington*, 542 U.S. 296, 303-04 (2004)). Other sentencing facts can be found by the district court using a preponderance of the evidence standard. *United States v. Kriegler*, 628 F.3d 857, 863 (7th Cir. 2010). The recent trend, in order to circumvent later constitutional concerns, has been to submit more facts to the jury. *See United States v. Booker*, 543 U.S. 220, 277-78 (2005) (Stevens, J., dissenting) ("In many cases, prosecutors could avoid an [*Apprendi*] problem simply by alleging in the indictment the facts necessary to reach the chosen Guidelines sentence.").

The Supreme Court continued this trend in *Southern Union*. A jury convicted Southern Union, a natural gas distributor, on one count of violating the Resource Conservation and Recovery Act of 1976, which allowed for the imposition of a fine not more than $50,000 per day of violating the Act. *Southern Union*, 132 S. Ct. at 2349. The probation office determined Southern Union had violated the Act for 762 days, so a maximum fine of $38.1 million was appropriate. *Id.* The district court imposed a $6 million fine, plus a "community service obligatio[n]" of $12 million. *Id.* Southern Union argued that *Apprendi* applied to criminal fines, and because

the jury was only required to find a violation for one day (the jury verdict form only listed the violation's start date), the district court's imposition of a fine greater than the $50,000 single-day penalty required extra fact-finding in violation of *Apprendi*. *Id.* The Government contended that *Apprendi* did not apply to criminal fines. *Id.* The U.S. Court of Appeals for the First Circuit accepted the Government's argument and upheld the fine. *Id.*

The Supreme Court reversed, holding that "the rule of *Apprendi* applies to the imposition of criminal fines." *Id.* at 2357. The Court stated that it had never distinguished between types of punishments—e.g., sentences, penalties, or punishments—and "[w]here a fine is substantial enough to trigger a party's [Sixth Amendment jury trial right], *Apprendi* applies in full." *Id.* at 2351-52. In response to the Government's policy concerns, the Court concluded that applying *Apprendi* to criminal fines was simply an expected extension of the doctrine. *Id.* at 2357.

We review an *Apprendi* challenge *de novo*. *Seymour*, 519 F.3d at 709. However, Wolfe failed to object to the restitution order on *Apprendi* grounds in the district court, so the Government argues we should review his argument for plain error. *See United States v. Fluker*, Nos. 11-1013, 11-3008 & 11-3082, 2012 U.S. App. LEXIS 22219, at *34 (7th Cir. Oct. 26 2012) (stating that we review a sentencing challenge for plain error if it was not made in the district court). Wolfe points out, and a review of our case law demonstrates, a disputed question

as to which standard should be applied to an *Apprendi* challenge if the issue was not raised in the district court. Citing *United States v. Kamoga*, 177 F.3d 617, 622 n.5 (7th Cir. 1999), Wolfe contends we should apply a *de novo* review because the question before us is purely legal—i.e., whether restitution is a criminal penalty, subject to *Apprendi*.

An *Apprendi* challenge is reviewed for plain error if it was not made in the district court.[12] *See United States v. Hernandez*, 330 F.3d 964, 979 (7th Cir. 2003). Accordingly, we review Wolfe's *Apprendi* argument for plain error.

Now to the merits of Wolfe's argument:

Wolfe argues that his restitution order is similar to the criminal fine in *Southern Union* because the order is a "life-long payment burden." Yet, the only way *Southern Union* may affect the outcome of this case is if we first conclude restitution is a criminal penalty. (If so, the issue becomes whether *Southern Union*'s holding that *Apprendi* applies to criminal fines should extend to another type of criminal penalty: restitution.) Reaching

---

[12] To the extent Wolfe believes that we should create an exception to this rule because of the Government's contention that a legal argument on appeal based on a subsequent Supreme Court case can never present a "clear or obvious" error, we do not need to decide this issue because the result here is the same regardless of which standard of review is applied. *See United States v. Boden*, 854 F.2d 983, 990 n.2 (7th Cir. 1988) (stating that "[i]n almost all cases, including this one, the result will be the same under any standard").

such a conclusion, however, would be in direct opposition to this Circuit's well-established precedent that restitution is not a criminal penalty. *See United States v. Bonner*, 522 F.3d 804, 807 (7th Cir. 2008); *see also United States v. LaGrou Distrib. Sys., Inc.*, 466 F.3d 585, 593 (7th Cir. 2006) ("We reiterate: restitution is not a penalty for a crime for *Apprendi* purposes since restitution for harm done is a classic civil remedy that is administered for convenience by the courts that have entered criminal convictions." (internal quotation marks omitted)). Wolfe admitted this at oral argument and conceded that we would have to overrule our precedent to find in his favor.

Having examined our sister circuits who have addressed whether restitution is civil or criminal in nature, we find ourselves in the minority. Only the Eighth and Tenth Circuits, like us, have found restitution to be civil in nature. *See United States v. Millot*, 433 F.3d 1057, 1062 (8th Cir. 2006) (stating that restitution orders "are not in the nature of a criminal penalty." (quoting *United States v. Carruth*, 418 F.3d 900, 904 (8th Cir. 2005))); *United States v. Nichols*, 169 F.3d 1255, 1279-80 (10th Cir. 1999) (stating that the purpose of restitution under the Victim Witness Protection Act "is not to punish defendants or provide a windfall for crime victims but rather to ensure that victims, to the greatest extent possible, are made whole for their losses." (quoting *United States v. Arutunoff*, 1 F.3d 1112, 1121 (10th Cir. 1993))).

But a "compelling reason" is required to overrule our Circuit's precedent. *United States v. Kendrick*, 647 F.3d 732,

734 (7th Cir. 2011). Being in the minority is not enough. This is true even if the trend is against us. *See Patel v. Holder*, 563 F.3d 565, 569-71 (7th Cir. 2009) (Ripple, J., concurring) (agreeing with the court's judgment because it was based on this Circuit's precedent but writing separately to discuss how our interpretation of the statute "puts us on the distinct minority side of an intercircuit split"); *but see Russ v. Watts*, 414 F.3d 783, 788 (7th Cir. 2005) (describing why we may overturn our Circuit precedent if no other circuit accepts it (quoting *United States v. Hill*, 48 F.3d 228, 232 (7th Cir. 1995))). Wolfe's only other arguments as to why we should treat restitution as a criminal penalty are that the Supreme Court referred to restitution as a "criminal punishment" in *Pasquantino v. United States*, 544 U.S. 349, 365 (2005), the restitution order is a "significant infringement on [his] freedom," and *Apprendi* should be "extended broadly."

We have already rejected the *Pasquantino* argument, so that argument is unavailing. S*ee Bonner*, 522 F.3d at 807. Likewise, whether a court judgment infringes upon someone's life does not make the judgment inherently criminal. For example, a defendant who is found liable in a civil tort case could also be on the hook for a significant damage award. *See, e.g.*, *Kimberlin v. DeLong*, 637 N.E.2d 121, 129 (Ind. 1994) (upholding a $1,610,000 jury verdict against the defendant in an intentional tort case). That type of award would surely infringe upon an individual's financial freedom, but no one would argue that the damage award, imposed under the same preponderance of the evidence standard Wolfe

essentially contests, invokes any Sixth Amendment concerns. And the degree to which *Apprendi* is extended has little value when answering the initial question before us: whether restitution is a criminal penalty. As we stated, *Southern Union* and the scope of *Apprendi* only come into consideration if we first conclude restitution is a criminal penalty. We decline to reach such a conclusion.

Wolfe has not provided us with a compelling reason as to why the holding in *Southern Union*—or this case in general— should be used as the vehicle to overturn our long-standing Circuit precedent that restitution is not a criminal penalty. The district court's restitution order was not required to be supported by the jury's fact-finding, and therefore, it did not violate Wolfe's Sixth Amendment rights.

## III. CONCLUSION

We AFFIRM the judgment of the district court for the reasons discussed above.