In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-2117

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

HURLEY C. JACKSON,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:15-cr-00122-wmc-4 — **William M. Conley**, *Judge.*

ARGUED APRIL 6, 2018 — DECIDED AUGUST 3, 2018

Before EASTERBROOK, RIPPLE, and HAMILTON, *Circuit Judges.*

RIPPLE, *Circuit Judge.* A jury found Hurley C. Jackson guilty of conspiracy to distribute over 1,000 grams of heroin, in violation of 21 U.S.C. §§ 841(a)(1) and 846; possession with intent to distribute a substance containing heroin, in violation of 21 U.S.C. § 841(a)(1); and distribution of a substance containing heroin, also in violation of 21 U.S.C. § 841(a)(1). He

claims that the district court abused its discretion when it allowed a witness to testify that Mr. Jackson had threatened to kill her. He also maintains that the prosecutor's closing argument included improper vouching and invited the jury to consider matters other than his guilt in reaching its verdict. According to Mr. Jackson, these remarks so infected the jury's deliberations as to require a new trial.

Mr. Jackson's arguments are unpersuasive. The threat testimony was both relevant to, and probative of, the central issue in this case: whether Mr. Jackson conspired to distribute heroin. Additionally, even if the prosecutor's comments were improper, the evidence against Mr. Jackson was substantial. Consequently, the prosecutor's comments did not affect the jury's verdict. We therefore affirm Mr. Jackson's conviction.

# I

## BACKGROUND

### A.

The conspiracy charged in the indictment began on December 11, 2013, when Mr. Jackson, an admitted heroin distributor, was arrested in Plover, Wisconsin. Immediately after his admission at the Portage County Jail, Mr. Jackson called his brother, Charles D. Hall, and told Hall to retrieve heroin that Mr. Jackson had hidden at the hotel where he had been staying.[1] Hall did so and, at Mr. Jackson's instructions, took

---

[1] The possession of this heroin was the basis for Count 2 of the superseding indictment.

the heroin to Cody Thompson. Thompson showed Hall how to break down the heroin and to sell it.

While Mr. Jackson was incarcerated, Hall continued to procure heroin through Mr. Jackson's contact, Dewight Williams, and to dispense the heroin to Mr. Jackson's sub-distributors. When Hall was incarcerated in February 2014 for driving while intoxicated, he recruited Marguerite Tompkins to continue the operation. Like Hall, Tompkins obtained heroin from Williams, broke it down, and provided it to sub-distributors.

Hall was released from custody in May 2014. Later in the summer of 2014, Mr. Jackson instructed Hall to pay a visit to Tiffany Bell, Mr. Jackson's former girlfriend and distributor, who recently had been released from prison. Hall and Williams went to see Bell. During the visit, Mr. Jackson placed a call to Hall's cell phone so that he could speak to Bell and try to persuade her to sell heroin on their behalf. Bell was non-committal, but, when Mr. Jackson was released from custody in September 2014, she began selling heroin for him.

In December 2014, Bell was involved in the sale of heroin to a user and police informant, Casey Edlebeck. Edlebeck had come to know Mr. Jackson when he called Hall to purchase heroin, and Mr. Jackson had made the delivery. At the request of the police, Edlebeck texted Mr. Jackson to arrange to purchase heroin. Mr. Jackson told Edlebeck to go to a local McDonald's, where the sale would take place. When Edlebeck arrived at the McDonald's, he again texted Mr. Jackson, who instructed him to look for a gold Cadillac. Bell arrived at the McDonald's in a gold Cadillac, and the exchange was made. Photographs of the text messages and of the transaction confirm these events.

During the latter part of 2014 and into 2015, Mr. Jackson, his brother Terrance Jackson,[2] Hall, and Williams pooled their funds to make bulk heroin purchases. They employed several individuals who were addicted to heroin—Hannah Hovick, Thompson, Megan Pray-Genett, and Tanya Kluck—to help transport, test, and distribute the heroin. For instance, Hovick, who was both a user and in a romantic relationship with Terrance, traveled with Terrance numerous times to Mr. Jackson's home to pick up Terrance's heroin. Terrance would give her approximately ten to twenty grams of heroin per day for delivery to customers, in exchange for which she would obtain heroin for her own use.

In May 2015, Hovick also made the first of three trips to Chicago for Terrance, Williams, and Mr. Jackson. Her role on these trips was to test the quality of the heroin before it was brought back to Wisconsin for distribution. The night before the first trip, Hovick was in a car with Terrance and Mr. Jackson. Mr. Jackson put his arm around Hovick's neck, held a gun to her head, and stated, "If you ever talk to the police, I will kill you."[3]

The coordinated distribution efforts among Williams, Hall, Terrance, and Mr. Jackson continued throughout 2015.

**B.**

In January 2016, a grand jury charged Mr. Jackson, Terrance, Hall, and Williams in a fourteen-count indictment with conspiracy to distribute, possession with intent to distribute,

---

[2] To prevent confusion, we refer to Terrance Jackson as Terrance.

[3] R.398 at 56.

and distribution of a substance containing heroin. Terrance, Hall, and Williams all reached plea agreements with the Government. Mr. Jackson proceeded to trial on the three counts of the indictment in which he was named: conspiracy to possess with intent to distribute 1,000 grams or more of heroin (Count 1); possession with intent to distribute a substance containing heroin on December 11, 2013 (Count 2); and distribution of a substance containing heroin on December 9, 2014 (Count 3).

Prior to trial, Mr. Jackson moved to exclude the testimony of Hovick regarding the threat. He asserted that this testimony was impermissible character evidence under Federal Rule of Evidence 404(b).[4] When the motion was argued before the court, however, Mr. Jackson submitted that the testimony should be excluded under Federal Rule of Evidence 403 because the danger of prejudice substantially outweighed its probative value.[5] The court concluded that the testimony should not be excluded under Rule 403:

> I understand the potential prejudice any time a gun is introduced into any transaction. But I have to confess, given Ms. Hovick's role and the reasons why your client, if she is believed, may

---

[4] *See* R.269. Federal Rule of Evidence 404(b)(1) states: "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."

[5] Federal Rule of Evidence 403 states: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

> have wanted to intimidate her and her conduct
> during the course of her involvement in the al-
> leged conspiracy I think outweighs that.[6]

The court therefore allowed Hovick to testify as to Mr. Jackson's threat.

At trial, the Government offered the testimony of fifteen witnesses: six law enforcement officers, one records custodian, and eight cooperating witnesses. The exhibits included photographs, cell phone records, text messages, recordings of jail calls, wire transfers, and a letter written by Mr. Jackson to Bell shortly before his trial promising that, should he be acquitted, he would visit Bell in prison and "send [her] money all the time."[7]

Mr. Jackson also testified. He admitted that he was a heroin dealer, but denied the existence of a conspiracy to distribute heroin. He testified that Hall, Terrance, and Williams were all his "competition" and that "[e]verything was completely separate."[8]

During closing argument, counsel for the Government made the following statements, none of which elicited a contemporaneous objection:

> Last point. Remember that Bell and Tomp-
> kins and Hall are hoping to get a lower sentence
> from the Court, right? As you probably figured

---

[6] R.400 at 6–7.

[7] R.356 at 61 (discussing Gov't Ex. 8A).

[8] R.401 at 8.

out by now, Judge Conley sentenced the partic-
ipants of the conspiracy and he knows the facts.
Do you really think that Bell, Thompson and
Hall are going to lie in front of the person that
they are hoping for a break from?

Deals are also worth reviewing in the con-
text of this case. Why is it unambiguously good
for the criminal justice system to provide incen-
tives to people who cooperate against those
higher up in the drug distribution chain? It's un-
ambiguously good. The only way to hold peo-
ple accountable at the top of the distribution
chain is to provide incentive to the lower-eche-
lon distributors.[9]

Later in the argument, counsel for the Government elaborated
on the benefits of plea deals:

The argument that these deals are unsavory
is really drained of its persuasive force when
you consider that but for the cooperation of
lower-echelon people, then the people at the top
are going to go free and we're never going to
stop people like the defendant, and the defend-
ant here particularly here today, from dumping
the poison of heroin into central Wisconsin.[10]

The jury convicted Mr. Jackson on all three counts.
Mr. Jackson timely appealed.

---

[9] *Id*. at 109–10.

[10] *Id*. at 111.

## II

## DISCUSSION

### A.

Mr. Jackson first maintains that the district court should have prevented Hovick from testifying regarding the threat. We review a district court's ruling on the admissibility of evidence under Rule 403 for an abuse of discretion. *United States v. Strong*, 485 F.3d 985, 991 (7th Cir. 2007). "[W]e have held that '[t]he court's admission of evidence under Rule 403 … is entitled to special deference. Only in an extreme case are appellate judges competent to second-guess the judgment of the person on the spot, the trial judge.'" *Id.* (second alteration in original) (quoting *United States v. Gardner*, 211 F.3d 1049, 1055 (7th Cir. 2000)).

Here, Mr. Jackson admits that the threat testimony is relevant.[11] Nevertheless, he contends that it was highly prejudicial because "the insidious image of Mr. Jackson threatening cold-blooded murder infected the whole trial."[12] He also maintains that it had little probative value because it was cumulative of other evidence that Mr. Jackson was an active member of the conspiracy.[13]

Although the threat evidence no doubt had an impact on the jury, it constituted fewer than two pages of the over five hundred pages of testimony that the jury heard. We therefore

---

[11] *See* Appellant's Br. 27.

[12] *Id*. at 30–31.

[13] *See id.* at 27–28.

disagree that this image infected the entire trial. Moreover, this testimony was not merely cumulative of other evidence establishing Mr. Jackson's participation in the conspiracy. It explained how Mr. Jackson was able to keep control of the heroin distribution when some individuals may have been interested in selling for themselves.[14] The testimony also demonstrated how Mr. Jackson was able to recruit individuals who initially were reluctant to join him, such as Bell. Finally, it countered an anticipated attack on Hovick's truthfulness. When Hovick first was detained, she failed to mention that Mr. Jackson was involved in the conspiracy—a point that defense counsel made on cross-examination.[15] The fact that Mr. Jackson had threatened her life explains her reluctance to provide his name to the authorities.

Given the testimony's relevance and probative value, the district court acted within its wide discretion in overruling the Rule 403 objection and allowing the jury to hear the testimony.

**B**.

Mr. Jackson also submits that comments made during the Government's closing argument deprived him of a fair trial. Generally speaking, we employ a two-step analysis to deter-

---

[14] *See* R.401 at 121 (defense counsel arguing on closing that Hall, Williams, and Bell "all had their own individual operations" and "their own customers").

[15] *See* R.398 at 59 (Hovick admitting that she had not been forthright with the police when she had been detained).

mine whether remarks made during closing argument require reversal of a conviction. "First, we consider whether the challenged remark was improper, and second, whether the remark deprived the defendant of a fair trial." *United States v. Wolfe*, 701 F.3d 1206, 1211 (7th Cir. 2012).

A prosecutor's comments may cross this line in several ways. Most pertinent to Mr. Jackson's appeal, a prosecutor may not vouch personally for the credibility of a witness because it "threatens to undermine the jury's role as independent factfinder[] … by placing the prestige of the government behind the witness." *United States v. Renteria*, 106 F.3d 765, 767 (7th Cir. 1997). The same threat arises if the Government places the prestige of the court behind the witness. *See United States v. Carroll*, 26 F.3d 1380, 1382, 1389 (6th Cir. 1994) ("Further, the prosecutor placed the prestige of the government, and even of the court, behind the credibility of the [witnesses], by stating that, if the government or the judge did not believe that the witnesses were being truthful, the witnesses would be in jeopardy."). Additionally, a "prosecutorial comment during closing arguments is improper if it is 'aimed at inflaming the passions of the jury,'" *United States v. Dvorkin*, 799 F.3d 867, 884 (7th Cir. 2015) (quoting *United States v. Caliendo*, 910 F.2d 429, 436 (7th Cir. 1990)), or if it "invites the jury to convict the defendant in order to punish or deter other persons not on trial," *United States v. DeSilva*, 505 F.3d 711, 718 (7th Cir. 2007).

If the remark is improper, we ask "whether the remark deprived the defendant of a fair trial." *Wolfe*, 701 F.3d at 1211. The prejudice inquiry is informed by five factors: "(1) the nature and seriousness of the misconduct; (2) the extent to which the comments were invited by the defense; (3) the extent to

which any prejudice was ameliorated by the court's instruction to the jury; (4) the defense's opportunity to counter any prejudice; and (5) the weight of the evidence supporting the conviction." *Id*. (quoting *United States v. Adams*, 628 F.3d 407, 418–19 (7th Cir. 2010)).[16]

We need not linger over the question whether the remarks were improper because, even if they were, they did not affect the outcome of the trial. Looking first to "the nature and seriousness of the misconduct," *Wolfe*, 701 F.3d at 1211 (internal quotation marks omitted), we concluded that this factor weighed in the defendant's favor when a prosecutor discussed "the nine circles of hell depicted in Dante's *Inferno*" and assigned the defendant "to the innermost circle reserved for the worst of the damned," *United States v. Klemis*, 859 F.3d 436, 442 (7th Cir. 2017). By comparison, the prosecutor's remarks here were not as inflammatory, nor were they the focus of the closing argument.

Additionally, the comments directly responded to the defense's efforts to undermine the credibility of witnesses based on their cooperation with the Government. *See Wolfe*, 701 F.3d

---

[16] However, when the defendant fails to object to the remarks during trial, as defense counsel failed to do here, our review is even more deferential. In such cases, we will reverse only if the defendant meets the plain error standard by showing a clear or obvious error that both "affected the defendant's substantial rights" and "seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Tucker*, 714 F.3d 1006, 1011 (7th Cir. 2013). Here, we conclude that there is no error under the five-factor test set forth in *United States v. Wolfe*, 701 F.3d 1206 (7th Cir. 2012). *See infra* pp. 11–14. Therefore, we need not consider the other requirements of the plain-error standard.

at 1211 (considering "the extent to which the comments were invited by the defense" (internal quotation marks omitted)). During cross-examination, defense counsel explored the nature of the witnesses' cooperation and how their plea arrangements might have influenced their testimony.[17]

The other *Wolfe* factors also weigh against a finding that the comments impacted the jury. Because the remarks came during the Government's closing, as opposed to rebuttal, defense counsel had the opportunity to counter these statements. Furthermore, any prejudice resulting from the prosecutor's comments was ameliorated to some degree by the court's instructions that counsels' arguments were not evidence[18] and that the jury must consider the testimony of co-operating witnesses "with caution and great care."[19]

---

[17] *See, e.g.*, R.364 at 40 (defense counsel asking Thompson about the reason that he spoke to police, the reason he was testifying, and the sentence he received); *id*. at 213 (defense counsel asking Edlebeck about leniency he had received in sentencing); R.399 at 11 (defense counsel asking Bell if she was "trying to get time knocked off [her] sentence" by testifying).

[18] *See* R.398 at 8 ("Any statements or any arguments that the lawyers make are not evidence. If what a lawyer says is different from the evidence as you hear it or see it, then the evidence is what counts.").

[19] R.401 at 69. Mr. Jackson argues that "the jurors could have interpreted the instruction as telling them to make sure to take caution and great care in rejecting testimony that could prevent law enforcement from being able to effectively prosecute drug dealers in the future." Appellant's Br. 21–22. This argument is without merit. We previously have observed that the instruction is "designed to inform the jury of a witness' potential bias" and "serve[s] that purpose." *United States v. Reed*, 227 F.3d 763, 770–71 (7th Cir. 2000). We do not believe that rational jurors would interpret the instruction as requiring them to give additional weight to the testimony of Government witnesses who are testifying pursuant to plea agreements.

Finally, Mr. Jackson's conviction was supported by overwhelming evidence. Here there were pooled funds and a shared supplier, both of which evidence a conspiracy. *See, e.g.,* *United States v. Lomax*, 816 F.3d 468, 474–75 (7th Cir. 2016) ("The government established that a conspiracy existed through its evidence … that [the defendants] shared customers, a supplier, and heroin, and pooled funds."). Specifically, Hall testified that he, Mr. Jackson, and Williams pooled their money so they could purchase large quantities of heroin.[20] Hovick described how she made three trips to the same location in Chicago where the conspirators purchased heroin. On each trip, she traveled with a different group of conspirators. The first trip involved Mr. Jackson, Terrance, and Williams; the second involved Mr. Jackson and Hall; the third involved Mr. Jackson and Williams. When they returned to Milwaukee, Mr. Jackson would divide the heroin.[21]

Testimony regarding shared customers provided further evidence of a conspiracy. *See id.* at 474; *United States v. Thompson*, 944 F.2d 1331, 1343 (7th Cir. 1991) (noting that "shar[ing] customers and cooperat[ing] together when making sales" were evidence of a conspiracy). Thompson testified how Mr. Jackson would sometimes refer him (Thompson) to either Hall or Terrance to purchase heroin and how he (Thompson) would pay Williams for heroin he had received from Mr. Jackson.[22]

---

[20] *See* R.399 at 35.

[21] *See* R.398 at 36–48.

[22] *See* R.364 at 15–16.

Contrary to Mr. Jackson's suggestion,[23] the case against him was not wholly dependent on the testimony of cooperating witnesses. Photographs, telephone recordings and records, and text messages confirm individual transactions as well as collaboration by the conspirators. For instance, with respect to the beginning of the conspiracy, telephone records at the Portage County Jail show multiple calls from Mr. Jackson to Hall immediately following Mr. Jackson's arrest. As to Bell's sale of heroin to Edlebeck in December 2014, cell phone records corroborate that Mr. Jackson received an inquiry from Edlebeck and directed both Edlebeck and Bell to a specific location. Photographs of this location show an exchange between Bell and Edlebeck.[24] Finally, recordings of phone calls between Hall and Mr. Jackson establish that they maintained a shared inventory of heroin and that Mr. Jackson provided heroin to Hall's sub-distributors while Hall was incarcerated.[25]

In sum, there was substantial testimonial, documentary, and recorded evidence establishing Mr. Jackson's participation in the conspiracy to distribute heroin. We therefore cannot conclude that the remarks by the prosecutor had any effect on the jury's verdict.[26]

---

[23] *See* Appellant's Br. 23.

[24] *See* R.356 at 21–23.

[25] *See* R.399 at 43–49.

[26] Mr. Jackson also maintains that the cumulative errors at trial deprived him of a fair trial. *See* Appellant's Br. 31–32. Given that there was no error in the admission of Hovick's testimony or in the prosecutor's remarks, there is no resulting cumulative error.

**Conclusion**

For the foregoing reasons, the district court did not abuse its discretion in allowing Hovick to testify as to Mr. Jackson's threat against her. Nor did the prosecutor's remarks during closing argument affect the outcome of the trial. We therefore affirm the judgment of the district court.

AFFIRMED