Filed 7/2/13  P. v. Carranza CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>LUIS LAZARO CARRANZA et al.,<br><br>     Defendants and Appellants. | B239697<br><br>(Los Angeles County<br>Super. Ct. No. TA116321) |

APPEALS from judgments of the Superior Court of Los Angeles County. Patrick Connolly, Judge.  Affirmed.

Dan Mrotek, under appointment by the Court of Appeal, for Defendant and Appellant Luis Lazaro Carranza.

Jennifer A. Mannix, under appointment by the Court of Appeal, for Defendant and Appellant Miguel Cota.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Susan Sullivan Pithey and Mary Sanchez, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Luis Lazaro Carranza (Carranza) and Miguel Cota (Cota) were convicted of the murder of Jose Vera (Vera) and the attempted murders of David Garcia (Garcia) and Jose Loza (Loza). Carranza argues that the trial court committed prejudicial state and federal constitutional error when it excluded his third party culpability defense. Cota joins in that argument. In addition, Cota argues that his Sixth Amendment right to confrontation was violated when the trial court allowed the prosecutor to rely on certified minute orders to prove predicate offenses for purposes of a gang enhancement, and when it allowed the People's gang expert to express opinions based on testimonial hearsay. Beyond that, Cota contends that his right to a jury trial and proof of guilt beyond a reasonable doubt were violated when the trial court made findings of fact and imposed victim restitution fines that were punitive.

We affirm.

## FACTS

**The Prosecution's Case**

*The shooting*

On January 17, 2011, at around 9:00 p.m., Garcia, Vera and Loza were parked in a vehicle in front of Garcia's home. Garcia was in the driver's seat, Vera was in the front passenger seat, and Loza was sitting in the backseat directly behind Vera. As Garcia rolled a "joint," he looked in the rearview mirror and saw two men behind the car. Then he saw them approach the car on the driver's side. Garcia recognized one of the men as Carranza. Carranza looped around to the front of the car, went to the passenger side of the vehicle, peeked inside and returned to the front of the car. He said "[s]omething about 18th Street gang." The second man stood in front of the driver's side of the vehicle and was wearing a "bright colored shirt from the inside, and the sleeve was . . . darker in color." Loza heard the second man say "where you guys from" and "18th Street."

Carranza and the second man aimed guns and fired into the vehicle. Vera was shot in the head and killed. Garcia and Loza suffered multiple gunshot wounds. Afterwards, Carranza and the second man ran east on 98th Street and crossed Figueroa Boulevard.

2

*The evidence establishing Carranza as a shooter*

Garcia testified that at the time of the shooting, he had known Carranza for seven or eight years and also knew his brother, Adrian Carranza (Adrian). Prior to the shooting, Garcia was outside of his parent's house where he was living. Carranza approached and asked if Garcia knew who had beaten up Carranza's brother. Garcia said, "I don't mess with little kids. I don't want no problems." In response, Carranza said, "Well, this is my hood." Garcia said, "I don't like problems. Don't disrespect my house."

On January 18 or 19, 2011, Detective Scott Teubert of the Los Angeles Police Department showed Garcia two photo line-ups, one with Carranza's photo and one with Adrian's photo. Garcia circled Carranza's photo but not the one of Adrian. According to Garcia, he did not circle Adrian's photo because he was not present during the shooting. In court, Garcia identified Carranza as the person who was circled in the first photo line-up, and also as one of the men in a surveillance video taken just after the shooting of two men approaching the OK Market from the direction of the shooting.

Detective Douglas Simpson responded to the crime scene, saw Carranza standing on the corner of Figueroa and 98th Street and spoke to him for about a minute. Eventually, Detective Simpson reviewed the video from the surveillance cameras operated by the OK Market. In the video, he watched two males walk south on Figueroa Boulevard, cut across the OK Market parking lot and head in a southwesterly direction toward the market's south driveway. The time stamp on the video was 9:13 p.m. Detective Simpson immediately recognized one of the males on the video as Carranza.

From in and around the vehicle where the shooting occurred, Detective Gerardo Vejar recovered spent nine-millimeter bullet casings. Six bore the head stamp "S and B," three bore the head stamp "FC," and one bore the head stamp "PMC." Detective Vejar testified that an "FC" bullet and a "PMC" bullet can be fired from the same gun.

There was a two-story, rear house at 420 West 98th Street. During a search of the rear house, Sergeant Andrew Moody recovered spent nine millimeters casing from a dresser on the ground floor where Carranza and Adrian lived. One casing was marked "S

3

and B." Detective Teubert recovered the shirt worn by the second shooter in a dryer in the backyard.

Andre M. knew Carranza and lived in the neighborhood around 98th and Figueroa. On January 17, 2011, at 9:00 p.m., Andre M. heard gunshots. Soon after, while taking a shower, he heard Carranza through the bathroom window call out "Dre," which is Andre M.'s nickname, and then ask, "Can I stash something?" Andre M. looked out the window and said, "Yeah, whatever." The next morning, Andre M. went to a shed to feed his dogs. He saw a gun inside the shed.

When he was interviewed by the police, Andre M. said that the person outside the window said "it was Luis" and asked to "stash" something. Andre M. told the person to "put it in the shed." The person outside said, "It's locked," but Andre M. told him the window was open. Andre M. took the police to Carranza's house and said "that's where Luis lives."

Criminalist Allison Manfreda (Manfreda) opined that the six spent shell casings found near the passenger side of Garcia's vehicle, another spent shell casing found inside Garcia's vehicle under the front passenger seat, and the spent shell casings recovered from Adrian's dresser drawer were fired from the gun recovered from Andre M.'s shed, a semi-automatic Glock nine-millimeter pistol. As to a bullet and three pieces of a bullet jacket removed from Vera's body by the coroner, Manfreda testified that it was possible that they had been fired from the Glock.

*The evidence establishing Cota as a shooter*

At the hospital, Loza described one of the suspects who shot at the car as a male Hispanic wearing a yellow and blue shirt and a cap. Loza did not identify anyone from photo line-ups. At the preliminary hearing and trial, however, Loza identified Cota as a shooter.

While on the stand at trial, Garcia and Loza were shown a long sleeve, pullover shirt marked as an exhibit. They identified it as the same shirt that the second shooter wore on the night of the shooting. Garcia identified Cota as the second man with

4

Carranza in the surveillance video from the OK Market. On the video, Cota was wearing the same shirt that Garcia had seen the second shooter wearing.

Security officer Michael Calloway (Calloway), an ex-police officer, heard gunshots. As he drove to the intersection of Figueroa and 98th Street, he saw a male Hispanic cross Figueroa in a "fast trot" from west to east. The male had to jump back to avoid being hit by Calloway's car. In doing so, the male turned his face to the side, as if hiding it. Calloway followed the male to 420 West 98th Street and watched him walk down the driveway to the rear of the house. Later, the male reemerged after having changed clothes, and approached a parked Ford Explorer. Calloway asked who had walked to the back. The male said that no one had. Calloway then asked where the male was going, and he said that he was not going anywhere. The male went back into the house and Calloway alerted the police. They arrived and ordered the occupants of the house to come outside. Cota was one of the people who exited the house. Detective Teubert recovered the shirt worn by the second shooter in a dryer located in the backyard.

Sergeant Moody obtained buccal swabs from Carranza, Cota, Andre M., and Adrian. Cota's DNA profile matched the major DNA profile developed from the shirt worn by the second shooter.

A neighbor discovered a gun in a yard near the back of 420 West 98th Street. The gun was a nine-millimeter semi-automatic High Point. It had a "feedway stoppage," meaning that a casing that was supposed to have been ejected after having been fired failed to eject and was stuck inside the chamber. There were three bullets and one spent casing inside the gun. One of the bullets was marked "Fiocchi," one was marked "PMC" and the last was marked "FC." The spent casing was marked "FC." Manfreda, the criminalist, opined that the High Point pistol fired a spent bullet and four spent shell casings found outside on the front driver's side of the vehicle.

5

*Adrian's arrest and release*

Adrian was one of the people who came out of 420 West 98th Street.[1] The police asked Calloway to identify the person he had followed from the crime scene to the house after hearing gunshots. Calloway identified Adrian as that person. The police arrested Adrian. At the time, Adrian had four different types of bullets in his pocket for a nine-millimeter gun. Respectively, the bullets were labeled "Winchester," "Spear," "S and B," and "I." The police located shell casings for nine-millimeter bullets in Adrian's dresser drawer. Subsequently, the police reviewed the video from the OK Market and determined that the second person with Carranza was not Adrian. Based on witness statements and the OK Market video, Adrian was eventually released.

*The gang exert*

A gang expert testified regarding the gang allegations.[2]

**Defense**

Carranza testified that he has several "South Central L.A." tattoos that represent the place he grew up. He lived in the upstairs portion of the back house at 420 West 98th Street with his wife and three children. Adrian lived downstairs with his wife and five children. Carranza was 12 or 13 years old when he met Garcia—who was five years older—at school. Garcia supplied marijuana and they would smoke together.

In sixth grade, Carranza was in a tagging crew called "No Control" or "NC." Garcia was from a gang called "Krip Locals" or "Krazy Latinos" or "KLS." The members of No Control were supposed to be recruited into KLS during the sixth, seventh and eighth grades. Carranza refused to be recruited because he "didn't want to start banging."

While in No Control, Carranza had cousins who were in the 18th Street gang and began hanging out with them. Garcia did not like it, and Carranza and Garcia began "bumping heads." When he was 16 years old, Carranza was arrested for tagging. His

---

[1]     In the record, Adrian was sometimes referred to as Adrian Lazaro.

[2]     We summarize the substance of this testimony in part IIB of the Discussion.

6

mother reacted by sending him to Atlanta. He stayed for three months. While there, he was concerned about Adrian being pushed into the 18th Street gang. As a result, Carranza advised Adrian to stay away from gangs. But Adrian did not follow Carranza's advice. Adrian was beaten up by KLS. Then he got kicked out of high school, put on probation and sent to a camp.

When Carranza returned from Atlanta, he started working. His girlfriend got pregnant. He had no more interactions with the 18th Street gang. When he was arrested for the shooting, Carranza had a job working at a place that provided daycare and boarding for pets. Carranza denied being a member of the 18th Street gang at the time of the shooting. Carranza knew Cota, but they were not good friends. Cota was closer to Adrian.

Carranza thought that Adrian hung out with members of the 18th Street gang but was not sure. Garcia told Carranza that Garcia and Adrian had been "bumping heads" and had a "beef."

On the day of the shooting, Carranza was working around the house, and Cota and Adrian helped clean the garage. Later, Carranza and Cota bought beer at a liquor store. Cota was wearing a yellow shirt at the time. During that trip, Carranza saw an unknown man who also was wearing a yellow shirt. He had curly hair and a cap. Like a pimp, the unknown man was always present in the area. Around 9:00 p.m., by himself, Carranza headed back to the liquor store for more beer. He saw the unknown man again. Before going into the store, Carranza urinated in the parking lot. He heard gunshots, looked up and saw the unknown man in the yellow shirt running. At that point, Carranza ran up 98th Street toward Hoover Street. He called Adrian to come pick him up because of the gunshots but did not get an answer. Later, Carranza went back toward his house and watched the police from the corner of 98th Street. Soon after, he was arrested. He did not know how the yellow shirt ended up in his backyard dryer.

After Adrian was released, he was deported to Mexico. At the time of trial, he was still in Mexico.

**The convictions**

Following trial, the jury convicted Carranza and Cota of murder in the first degree, in violation of Penal Code section 187, subdivision (a),[3] and attempted premeditated, willful and deliberate murder in violation of sections 664, subdivision (a) and 187, subdivision (a).  The jury further found that the crimes were committed for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b)(1)(C), and that Carranza and Cota personally discharged firearms within the meaning of section 12022.53, subdivisions (b) through (d).

**The sentence; the restitution orders**

Carranza and Cota were sentenced to state prison for a total of 130 years to life.  Among other fines, fees, and assessments, they were ordered to make restitution to the victims pursuant to section 1202.4, subdivision (f) by paying $10,437.80, plus 10 percent interest to the state victim compensation board and $413.11, plus 10 percent interest to Rogacion Vera Varela.  Also, the trial court imposed a $240 restitution fine pursuant to section 1202.4, subdivision (b).

These appeals followed.

## DISCUSSION

**I.  The Third Party Culpability Defense.**

Carranza contends that the trial court erred when it precluded third party culpability evidence regarding Adrian based on relevance and hearsay.

We disagree.

A.  <u>The applicable law; standard of review</u>.

Third-party culpability evidence is admissible if it is capable of raising a reasonable doubt as to the defendant's guilt.  But evidence of a third party's mere motive or opportunity to commit the crime does not "raise a reasonable doubt about a defendant's guilt:  there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime."  (*People v. Hall* (1986) 41 Cal.3d 826, 833

---

[3]     All further statutory references are to the Penal Code unless otherwise indicated.

8

(*Hall*).)  Hearsay "is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated."  (Evid. Code, § 1200, subd. (a).)  Except as provided by law, hearsay evidence is inadmissible.  (Evid. Code, § 1200, subd. (b).)  We review the exclusion of third party culpability evidence and hearsay for an abuse of discretion.  (*People v. Lewis* (2001) 26 Cal.4th 334, 372–373; *People v. Cudjo* (1993) 6 Cal.4th 585, 607; *Thompson v. County of Los Angeles* (2006) 142 Cal.App.4th 154, 168.)  State law error is reviewed under *People v. Watson* (1956) 46 Cal.2d 818, 836 to determine whether "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error."

The federal Constitution guarantees a criminal defendant a meaningful opportunity to present a complete defense.  (*Crane v. Kentucky* (1986) 476 U.S. 683, 690.)  If that right has been violated, we must reverse a defendant's conviction unless the constitutional error was harmless beyond a reasonable doubt.  (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).)

B.  The ruling.

Before Detective Teubert was called by the People as their last witness, the trial court asked whether there were any admissibility issues pursuant to Evidence Code section 402, subdivision (b).  Carranza's counsel, Samuel Ziselman, stated that he planned to cross-examine Detective Teubert about other suspects that the police had, one of those being Adrian.  There was a videotaped interview of Adrian conducted by Detective Teubert and Sergeant Moody.  Mr. Ziselman intended to show the first portion of the interview—about three minutes—to the jury.

The trial court inquired about the relevance of the interview.  Mr. Ziselman stated the he wanted to ask why the police suspected Adrian.  In addition, counsel wanted to show and ask about Adrian's display of gang tattoos.  Counsel for Cota, Michael Clark, joined in the argument made by Mr. Ziselman.  The prosecutor objected based on relevance and hearsay.  In response to the objection, the trial court stated that the issue fell under *Hall*, and "third party culpability is not going to come in, in this trial, unless

9

there is more of a showing than what you've said. [¶] Mere motive and opportunity is not enough. There has to be some direct link to that individual, as far as the murder. Just because someone has been arrested for a crime and then released is not enough. [¶] So if you want to put forward more of an argument than that, I'd be willing to listen."

The following colloquy ensued.

"MR. ZISELMAN: It's not a question of just the fact he's been arrested. Arrested is neither here nor there, and that's not an indication of the facts. They had plausible reasons to believe that [Adrian] had participated in the crime. There was evidence at the time he was pulled out of the location, where—there are witnesses that have been tendered by the prosecution that he ran into—he was identified by one of the witnesses they put in. [¶] In addition to that, we've heard testimony of nine millimeter bullets. We know from testimony and from physical evidence that this—that these things were found upon [Adrian] shortly after the shooting, when he was extracted by law enforcement. [¶] In addition to that, we have 18th Street [gang] allegations in this matter. I believe there is good reason to believe that [Adrian] is an 18th Street gang member."

"THE [TRIAL] COURT: No doubt about that. [¶] I think that just from what we've heard, I think that [it is] proper to presume that he is 18th Street. There was also the collection of the two live rounds, multiple live rounds from his pants pocket. But the simple fact of the matter is that you have witnesses here who not only do not identify [Adrian] as being involved, you have the first witness in this entire case, Mr. Garcia, who is one of the victims, who states that [Adrian] was not a part of this crime. [¶] Regardless of the investigation that was done by the detectives and not to disparage the detectives, anyone can be wrong. This is a situation where they took it, whatever the filing situation was. But it does not meet the threshold under [*Hall*] and its progenies, and the court will not allow anything going to any conversation with [Adrian] or as to [Adrian] being one of the shooters in this case.

"MR. ZISELMAN: Understood.

"THE [TRIAL] COURT:  Okay.  But I've made a record, and I think you have also—so if I'm wrong and there is an appellate record, we've made that.  [¶]  . . .  [¶] All right.  So with that, is there anything further?

"MR. ZISELMAN:  Just one for the purpose of clarity.

"THE [TRIAL] COURT:  Sure.

"MR. ZISELMAN:  No references to [Adrian] as having—when speaking to Detective Teubert, regarding having—the possibility of having committed a crime, or you're just excluding the video.

"THE [TRIAL] COURT:  As to anything as to him being involved in the crime at all. . . .  Now, there is going to be some—there may be some touching of [Adrian], because let's be honest here, we've heard a lot about him and such.  But as to any interview, first of all, it's hearsay.  But, second of all, there is—again, I think this comes under third party culpability, and the case law is very specific as to that.  [¶]  All right.

"MR. ZISELMAN:  Understood."

C.  Scope of the ruling.

Carranza argues that the trial court precluded third party culpability as a defense theory of acquittal.  That contention is belied by the record.

The only issue presented to the trial court for a ruling was the admissibility of Detective Teubert's anticipated cross-examination testimony about his interview with Adrian, three video minutes of the interview, Adrian's display of gang tattoos, and the reasons why the police thought Adrian was a suspect in the shooting.  The trial court precluded the defense from going into those areas with Detective Teubert, or from showing three minutes of the video.  At no time did the trial court preclude the defense from eliciting third party culpability evidence from other witnesses called by the People, or from any witnesses that the defense offered.  Nor did the trial court preclude the defense from arguing third party culpability to the jury.

D.  Admissibility of Detective Teubert's anticipated testimony and the video.

Detective Teubert's personal opinion about Adrian's involvement in the shooting does not qualify for admissibility under *Hall* because it would not create a reasonable

doubt as to Carranza's guilt. Even if Adrian had been involved in some fashion, there is no reason to conclude that Carranza would therefore be excluded as a shooter. There was no offer of proof that Adrian and Carranza looked alike or that Garcia misidentified Carranza as a shooter. Nor was there an explanation as to how Detective Teubert's opinion would nullify either the OK Market video placing Carranza near the crime scene with the second shooter, Cota, or the testimony of Andre M. establishing that Carranza stashed the Glock in Andre M.'s shed. In addition to the foregoing, Detective Teubert's opinion regarding Adrian's potential guilt is not direct or circumstantial evidence linking Adrian to the crime.

We note that the trial court's ruling had the effect of precluding Detective Teubert from testifying about statements made by third persons insofar as they would have been offered to prove the truth of the matters stated. That aspect of the ruling was proper. The statements of third persons qualified as hearsay, and Mr. Ziselman advanced no argument as to why a hearsay exception applied. Indeed, he did not explain what statements by third persons he might have wished to elicit. It is supposable that if Detective Teubert at one point believed Adrian was involved in the shooting, his opinion was based on Calloway's identification of Adrian as a person who was trotting away from the crime scene while trying to hide his face, the bullets in Adrian's pocket and the spent casings from his dresser drawer. Mr. Ziselman did not explain why that evidence needed any confirmation by hearsay.

The only remaining issue is Adrian's gang tattoos witnessed by Detective Teubert and presumably on display in the videotaped interview, and that is the evidence that Carranza focuses on in his arguments.

Carranza argues that evidence of Adrian's gang tattoos—and therefore his gang affiliation—would have suggested that he killed Vera when that evidence was coupled with the gang statements of the shooters, the bullets found in Adrian's pocket, the shell casings found in his dresser drawer and Calloway's testimony. But, at most, this evidence suggests that Adrian may had have some nonspecific connection to the crime. More importantly, this evidence does not tend to preclude Carranza as being one of the

12

two shooters. (*People v. Brady* (2010) 50 Cal.4th 547, 559, fn. 5 [third party culpability evidence was speculative because it did not create "a lingering doubt by suggesting someone other than defendant was responsible for the murder"].) Thus, we conclude that the trial court did not err.

Cota joins in Carranza's argument. Because Carranza argues that the evidence shows that Adrian, and not Carranza, killed Vera, the argument does not inure to Cota's benefit. In any event, even if Adrian was the first shooter, that does not exclude Cota as the second shooter.

E. Harmless error.

Supposing that the trial court committed error, the error was harmless under either the state or federal standard.

The evidence of guilt was overwhelming. Garcia identified Carranza as a shooter and Loza identified Cota as a shooter. Both Garcia and Loza identified the yellow and dark shirt worn by the second shooter, and that shirt contained Cota's DNA. The video from the OK Market showed Carranza and Cota approaching the market soon after the shooting occurred, and Cota was wearing the shirt identified as the one worn by the second shooter. Andre M.'s testimony established that Carranza stashed the Glock in Andre M.'s shed. The police located Cota's shirt in the dryer in the backyard of 420 West 98th Street. Cota was at 420 West 98th Street on the night of the shooting when the police told the occupants to come outside. The High Point was discovered in a nearby backyard. The ballistics evidence established that the Glock and High Point fired bullets at the scene of the crime. The shooters made gang statements regarding the 18th Street gang, and the evidence favorable to the prosecution established that both Carranza and Cota were members of that gang. All of this evidence strongly established that Carranza and Cota were the shooters.

Though Carranza suggests that the jury was deprived of third party culpability evidence, that is not true. The jury also heard Calloway's testimony that Adrian was the person he had followed to 420 West 98th Street. Also, the jury heard that Adrian had nine-millimeter bullets in his pocket, and that spent shell casings fired by the Glock were

13

recovered from Adrian's dresser drawer. Finally, the jury heard Carranza's testimony in which he stated that he believed that Adrian hung out with the 18th Street gang members and that Adrian had a "beef" with Garcia. Thus, the jury essentially heard all the evidence necessary to conclude that Adrian was an 18th Street gang member with opportunity and a motive to shoot at Garcia. Despite all that, the jury nonetheless concluded that Carranza and Cota were the shooters. Evidence of Adrian's tattoos and gang affiliation would not have changed the verdicts for two reason. First, the evidence of Carranza's and Cota's guilt was strong and the evidence that Adrian was one of the shooters was speculative. Second, as acknowledged by Carranza, the defense did not argue third party culpability to the jury.

## II. The Certified Minute Orders; the Gang Expert.

Cota contends that his right to confrontation was violated when the trial court allowed the prosecutor to present certified minute orders of convictions to prove predicate offenses by the 18th Street gang members. But those certified minute orders were nontestimonial in nature. As a result, they do not give rise to confrontation clause concerns under the current state of the law.

Next, Cota argues that he was denied his right to confrontation when the prosecutor relied on the gang expert's testimony to prove motive, intent and knowledge of the shooting, and also to prove the gang motive behind the shooting, the 18th Street gang's primary activities, and the 18th Street gang's predicate offenses for the gang allegation. According to Cota, the gang expert's testimony was supported only by testimonial hearsay. We conclude that even if a gang expert is not entitled to rely on testimonial hearsay when forming an opinion, there is no basis to reverse because the record fails to establish that the foundation for the gang expert's various opinions was impermissible.[4]

---

[4] The People argue that Cota forfeited his Sixth Amendment argument by failing to object below. But given the state of the law, an objection would have been futile. We therefore decline to find a forfeiture.

A. The applicable law; standard of review.

Any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, is subject to a sentence enhancement. (§ 186.22, subd. (b)(1).) But first, "the prosecution must prove that the gang (1) is an ongoing association of three or more persons with a common name or common identifying sign or symbol; (2) has as one of its primary activities the commission of one or more of the criminal acts enumerated in the statute; and (3) includes members who either individually or collectively have engaged in a 'pattern of criminal gang activity' by committing, attempting to commit, or soliciting *two or more* of the enumerated offenses (the so-called 'predicate offenses') during the statutorily defined period. [Citations.]" (*People v. Gardeley* (1996) 14 Cal.4th 605, 617 (*Gardeley*); § 186.22, subds. (e) & (f).)

An expert may offer an opinion if the subject is sufficiently beyond common experience and the opinion would assist the trier of fact. (Evid. Code, § 801, subd. (a).) In general, the testimony of a gang expert meets this test. (*People v. Valdez* (1997) 58 Cal.App.4th 494, 506.) Beyond the foregoing, expert opinion must be "[b]ased on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates[.]" (Evid. Code, § 801, subd. (b).) Under the Evidence Code, an expert may rely on hearsay such as conversations with gang members and information gained from law enforcement colleagues and agencies. (*People v. Thomas* (2005) 130 Cal.App.4th 1202, 1209–1210 (*Thomas*).) But the ability of an expert to rely on hearsay without implicating the confrontation clause concerns is in flux.

As is relevant here, there are two broad categories of hearsay evidence: testimonial and nontestimonial. Not long ago, the United States Supreme Court explained the distinction in the context of police questioning. "Statements are

15

nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Davis v. Washington* (2006) 547 U.S. 813, 822; *Michigan v. Bryant* (2011) 562 U.S. ___ [131 S.Ct. 1143, 1155, 179 L.Ed.2d 93] (*Bryant*) ["the most important instances in which the [confrontation clause] restricts the introduction of out-of-court statements are those in which state actors are involved in a formal, out-of-court interrogation of a witness to obtain evidence for trial"].)

In *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), the court held that when nontestimonial hearsay is at issue, the confrontation clause does not bar it. Nor does the confrontation clause "bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted. [Citation.]" (*Id.* at pp. 59–60, fn. 9.) But testimonial hearsay to prove the truth of the matter asserted is not permissible unless the declarant is unavailable and the accused has had a prior opportunity to cross-examine the declarant. (*Id.* at pp. 59–60, fn. 9, p. 68; *Thomas*, *supra*, 130 Cal.App.4th at p. 1208.) The *Thomas* court stated that "*Crawford* does not undermine the established rule that experts can testify to their opinions on relevant matters, and relate the information and sources upon which they rely in forming those opinions. This is so because an expert is subject to cross-examination about his or her opinions and additionally, the materials on which the expert bases his or her opinion are not elicited for the truth of their contents; they are examined to assess the weight of the expert's opinion." (*Thomas*, *supra*, 130 Cal.App.4th at p. 1210; *People v. Sisneros* (2009) 174 Cal.App.4th 142, 153–154 [citing *Thomas* with approval]; *People v. Hill* (2011) 191 Cal.App.4th 1104, 1127–1128 [the court reluctantly followed *Thomas* on the theory that *Thomas* found its roots in the binding precedent of *Gardeley*].)

Subsequent developments in the law require us to examine the continuing precedential value of the *Thomas* line of cases.

16

In *Williams v. Illinois* (2012) 567 U.S. ___ [132 S.Ct. 2221, 183 L.Ed.2d 89] (*Williams*), "the prosecution called an expert who testified that a DNA profile produced by an outside laboratory . . . matched a profile produced by the state police lab using a sample of the [defendant's] blood." (*Id*. at p. 2227.) In the plurality opinion, Justice Alito stated that "[o]ut-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which [an] opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause." (*Id*. at p. 2228.) In the alternative, Justice Alito wrote that confrontation clause concerns were not implicated because the profile was "very different from the sort of extrajudicial statements, such as affidavits, depositions, prior testimony, and confessions, that the Confrontation Clause was originally understood to reach." (*Williams, supra*, at p. 2228.) Moreover, the profile was obtained before any suspect was identified and it was "sought not for the purpose of obtaining evidence to be used against [the defendant], who was not even under suspicion at the time, but for the purpose of finding a rapist who was on the loose." (*Ibid.*) According to Justice Alito, the profile was not "inherently inculpatory." (*Ibid*.) Also, the use of DNA evidence to exonerate people who have been wrongfully accused or convicted is well known. "If DNA profiles could not be introduced without calling the technicians who participated in the preparation of the profile, economic pressures would encourage prosecutors to forgo DNA testing and rely instead on older forms of evidence, such as eyewitness identification, that are less reliable. [Citation.] The Confrontation Clause does not mandate such an undesirable development. This conclusion will not prejudice any defendant who really wishes to probe the reliability of the DNA testing done in a particular case because those who participated in the testing may always be subpoenaed by the defense and questioned at trial." (*Ibid*.)

Justice Thomas also concluded that the confrontation clause was not violated, but he offered a separate, concurring analysis. He concluded that the disclosure of the outside laboratory's out-of-court statements by means of the expert's testimony did not violate the confrontation clause because it "lacked the requisite 'formality and solemnity' to be considered 'testimonial'" for purposes of the confrontation clause. (*Williams*,

17

*supra*, 132 S.Ct. at p. 2255 (conc. opn. of Thomas, J.).) He opined that "there was no plausible reason for the introduction of [the] statements other than to establish their truth." (*Id*. at p. 2256.) The remaining four justices joined in a dissent authored by Justice Kagan and rejected the idea that the expert's testimony was not offered for its truth. (*Id*. at pp. 2265, 2268 (dis. opn. of Kagan, J.).) Due to Justice Thomas's concurring opinion, Justice Kagen asserted that "[f]ive justices specifically reject every aspect of [the plurality's] reasoning and every paragraph of its explication." (*Id*. at p. 2265 (dis. opn. of Kagan, J.).)

After *Williams*, the California Supreme Court analyzed confrontation clause issues in *People v. Lopez* (2012) 55 Cal.4th 569 (*Lopez*), *People v. Dungo* (2012) 55 Cal.4th 608 (*Dungo*) and *People v. Rutterschmidt* (2012) 55 Cal.4th 650 (*Rutterschmidt*). All three cases involved witnesses who testified about technical reports that they did not prepare. (*Lopez*, *supra*, 55 Cal.4th at p. 573 [a laboratory analyst testified regarding a blood-alcohol level report prepared by a colleague]; *Dungo*, *supra*, 55 Cal.4th at p. 612. [a pathologist testified regarding the condition of the victim's body as recorded in an autopsy report prepared by another pathologist]; *Rutterschmidt*, *supra*, 55 Cal.4th at p. 659 [a laboratory director testified that his analysts had detected the presence of alcohol and sedatives in the victim's blood].) In *Lopez*, the court found no confrontation clause violation because the critical portions of the report regarding the defendant's blood-alcohol level were not made with "the requisite degree of formality or solemnity to be considered testimonial." (*Lopez*, *supra*, 55 Cal.4th at p. 582.) The *Dungo* court declined to find a confrontation clause violation because the "criminal investigation was not the *primary* purpose for the autopsy report's description of the condition of [the victim's] body; it was only one of several purposes. . . . The autopsy report itself was simply an official explanation of an unusual death, and such official records are ordinarily not testimonial." (*Dungo*, *supra*, 55 Cal.4th at p. 621.) The confrontation clause issue in *Rutterschmidt* was not reached because the court concluded that the evidence of guilt was overwhelming and any error was harmless beyond a reasonable doubt. (*Rutterschmidt*, *supra*, 55 Cal.4th at p. 661.)

Our Supreme Court synthesized the fractured *Williams* opinion and explained that "all nine high court justices agree that an out-of-court statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution." (*Lopez*, *supra*, 55 Cal.4th at p. 582.) But this rule sheds no light on whether a gang expert can provide an opinion that is based on hundreds of different bits of information, especially given the reality that gang experts often rely on a mixture of personal knowledge, nontestimonial hearsay and testimonial hearsay. In other words, a gang expert's opinion is likely based at least in part on matter that raises no confrontation clause concerns. Moreover, there is a practical distinction between a scientific or medical expert relying on a report versus a gang expert relying on multiple sources. With respect to a report involving DNA, blood-alcohol levels or an autopsy, the prosecution could simply call the person who prepared the report to testify. But in a gang case, it is a safe assumption that the prosecution could not call all the sources of testimonial hearsay to the stand to lay the foundation for the expert's opinion. Moreover, if a defense attorney must inquire into every bit of information relied upon by a gang expert, and if a trial court must then determine whether the expert's opinion is adequately supported by personal knowledge and nontestimonial hearsay, every gang allegation would result in a time-consuming trial within a trial. Because of these considerations, it is not clear whether our Supreme Court will disapprove of the *Thomas* line of cases.

All that said, for purposes of this opinion, we will assume that the gang expert was not entitled to rely on testimonial hearsay.

Whether the trial court violated Cota's right to confrontation is a constitutional issue subject to our de novo review. (*Vo v. City of Garden Grove* (2004) 115 Cal.App.4th 425, 433.) Error is subject to *Chapman* analysis. (*Rutterschmidt*, *supra*, 55 Cal.4th at p. 661.)

B. <u>The evidence</u>.

The trial court admitted into evidence two certified minutes orders. They showed that Juan Pablo Murillo (Murillo) and Leslie Ivon Aguirre (Aguirre) were convicted of predicate offenses.

19

The People called Officer Mario Cardona of the Los Angeles Police Department as an expert on the 18th Street gang. At the time of trial, he had been a police officer for more than 14 and a half years, and had been working in the gang unit with the 77th Division for five years.

Officer Cardona testified that the primary activities of the 18th Street gang included battery, vandalism, robberies, narcotics sales, possession of weapons, attempted murders, and murders. He also testified that Murillo and Aguirre are members of the 18th Street gang.

The prosecutor asked Officer Cardona how he formed the opinion that the 18th Street gang was a criminal street gang. He testified that he had done hundreds of investigations pertaining to suspects and victims in that gang; interacted with witnesses, suspects and confidential informants; listened to wire taps pertaining to the gang; and collected information on gang members with whom he had contact. As a result, Officer Cardona was familiar with the way the 18th Street gang members dressed, the type of tattoos they have, their culture and their slang. It was his job to know "who their associates were, who their parents [were], where their residence[s] were, what type of cars they drove, their girlfriends, [and] their wives[.]" He reviewed reports regarding other cases and investigations regarding the gang.

Officer Cardona testified that in gang terminology, "putting in work" means committing crimes or going on missions. When a gang member puts in work, his reputation is bolstered. A gang member yells out his gang affiliation before a shooting to promote the gang, let the victims know whose turf they are in and intimidate the community. If a community is intimidated, no one will call the police when there is a crime. That benefits the gang.

Officer Cardona was asked a hypothetical question based on the facts of the shooting in the case. He opined that the crime was committed for the benefit of a criminal street gang.

As a gang officer, Officer Cardona had come into contact with Cota on various occasions. Cota had several gang-related tattoos, including an "E" for "18th Street" on

20

the back of his head, the number "18" on his chest, "BEST" on his back, which stands for Barrio 18th Street, and "18th Street" tattooed across his knuckles. Officer Cardona opined that Cota was an 18th Street gang member, based on Cota's self-admission to Officer Cardona during numerous contacts, Cota's association with other admitted gang members, the gang areas where Officer Cardona has stopped Cota, and his tattoos.

C. Motive.

Cota argues that Officer Cardona's testimony regarding the possible motive for a gang member to commit a murder was based on classic testimonial hearsay—police interviews with suspected gang members and informants, often in the form of police-initiated field detentions.

To establish his assertions, Cota cites the following testimony: Officer Cardona graduated from the Los Angeles Police Department Academy where he received block instruction on gangs. He worked in a gang unit for five years and twice attended Cal Gang Investigators Association seminars. In addition, he received training from senior detectives and read books. Students doing their thesis on gangs have interviewed him. Time Magazine wrote about Detective Cardona's unit after doing a ride-a-long. He interviewed gang members who have written books, and undercover officers who have written books. Beyond that, Officer Cardona testified as a gang expert regarding five different gangs.

None of this testimony establishes that Officer Cardona formed an opinion about the motive for the shooting by relying on hearsay statements made for the primary purpose of a criminal prosecution. As a result, we perceive no confrontation clause issues. Indeed, based on the cited evidence, much of Officer Cardona's knowledge about gangs comes from his training, reading and interviews with people who have written books, none of which can be characterized as testimonial hearsay. And later in his testimony, he stated that he has listened to wiretaps. We fail to see how statements on a wiretap can qualify as testimonial insofar as the statements were not responsive to police interrogation and the declarants had no idea that their statements were being recorded. Also, Officer Cardona said that he spoke to various people—confidential informants,

21

gang members, fellow officers—but the context of those conversations is not revealed in the record. We therefore cannot determine whether any related statements were testimonial.

Finally, when Officer Cardona testified regarding the reasons why gang members put in work by committing crimes, and when he testified that a hypothetical shooting based on the facts of the case would benefit a gang, he was not asked to lay a foundation. Thus, we do not have a sufficient record for evaluating whether he relied on testimonial hearsay, or for evaluating whether his opinion would have been supported by nontestimonial hearsay and personal knowledge.

D. <u>Primary activities</u>.

Officer Cardona opined regarding the 18th Street gang's primary activities. Cota tells us that it is unclear what the foundation for his opinion is. However, per Cota, Officer Cardona testified that: Most of his information and expertise on gangs came from investigating gang crimes, reviewing investigation reports, and talking to gang members. Also, he gathered information from informants, as well as from law enforcement agencies and other police officers.

Cota refers us to Officer Cardona's testimony regarding his background and training, and also to his statements that the 18th Street gang is a criminal street gang; he has done several hundred investigations that pertain to the 18th Street gang; he has "sat with witnesses;" he has "sat in with suspects, interviews, also confidential informants;" "I've listened to wire taps regarding this gang;" "I have gathered information on its gang members that I've come in contact with;" "I am familiar with the way they dress, the type of tattoos that they don on their body, the culture and slang;" and "[i]t was my job to know" their families and who they associated or socialized with. Officer Cardona spoke to suspects and victims he believed were the 18th Street gang members, and he reviewed reports regarding other investigations into the gang. The 18th Street gang has common signs or symbols. He testified regarding the gang's primary activities and gang territory.

None of this testimony establishes whether Officer Cardona's opinion regarding the 18th Street gang comes from testimonial or nontestimonial hearsay, or whether it comes from personal knowledge.

E.  Aguirre's membership in the 18th Street gang.

According to Cota, Officer Cardona's opinion that Aguirre was a member of the 18th Street gang was based on testimonial hearsay.  That assertion is not established by the record.  Officer Cardona testified that he was familiar with Aguirre and believed her to be a member of the 18th Street gang.  Though he stated that he spoke to other officers about Aguirre, at no point did Officer Cardona state the basis for his opinion.  For all we know, his opinion could be sufficiently based on facts that Officer Cardona witnessed, such as Aguirre's tattoos, her use of gang signs, her presence in gang strongholds, etc.  As a result, we cannot conclude that Officer Cardona's opinion violated the confrontation clause.

F.  Predicate offenses.

Cota complains that the certified minutes orders of the convictions of Aguirre and Murillo were testimonial.  This argument was waived because Cota did not object to the certified minute orders.  (*People v. Larson* (2011) 194 Cal.App.4th 832, 837 (*Larson*).)  In any event, the minute orders were not prepared to establish or prove a fact at trial.  Instead, they were prepared for the nontestimonial, administrative purpose of documenting criminal proceedings as a matter of court business and public record.  (*Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 324 [documents created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial are not testimonial]; *People v. Perez* (2011) 195 Cal.App.4th 801, 803 [copies of prison packets are nontestimonial and therefore do not implicate the confrontation clause]; *People v. Moreno* (2011) 192 Cal.App.4th 692, 710–711 [same]; *Larson*, *supra*, 194 Cal.App.4th at pp. 836–837 [certified records of prior convictions do not violate the confrontation clause].)  Consequently, we easily conclude that the certified minute orders did not raise confrontation clause concerns.

23

Officer Cardona testified that he spoke to an Officer Hernandez about Aguirre's conviction for robbery and read Officer Hernandez's report. As Cota suggests, any information Officer Cardona obtained from Officer Hernandez might be testimonial hearsay. But Officer Cardona's reliance on it to establish a predicate offense was harmless error under *Chapman*. The certified minute order of Aguirre's conviction also established a predicate offense.

## III. The Restitution Orders.

According to Cota, he had a right to a jury trial on the facts pertinent to the victim restitution orders under section 1202.4, subdivision (f). We disagree.

Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. (*Apprendi v. New Jersey* (2000) 530 U.S. 466, 490 (*Apprendi*).) The statutory maximum under *Apprendi* is the maximum sentence a judge can impose based on facts reflected in the jury verdict or admitted by the defendant. (*Blakely v. Washington* (2004) 542 U.S. 296, 303 (*Blakely*).) The *Apprendi/Blakely* rule has been extended to criminal fines. (*Southern Union Co. v. United States* (2012) 567 U.S. ___ [132 S.Ct. 2344, 2348–2349, 183 L.Ed.2d. 318] (*Southern Union*); *United States v. Day* (4th Cir. 2012) 700 F.3d 713, 732 (*Day*).)

Lower federal courts have held that *Apprendi* does not apply to restitution orders. (*Day*, *supra*, 700 F.3d at p. 732; *United States v. Wolfe* (7th Cir. 2012) 701 F.3d 1206, 1217; *U.S. v. Wooten* (10th Cir. 2004) 377 F.3d 1134, 1144, fn. 1.) So, too, has the California Court of Appeal. In *People v. Pangan* (2013) 213 Cal.App.4th 574, 585, the court held: "[N]either *Southern Union*, *Apprendi* nor *Blakely* have any application to direct victim restitution, because direct victim restitution is not a criminal penalty. As explained in *U.S. v. Behrman* (7th Cir. 2000) 235 F.3d 1049, 1054, direct victim restitution is a substitute for a civil remedy so that victims of crime do not need to file separate civil suits." Prior to that, *People v. Millard* (2009) 175 Cal.App.4th 7, 35 held that victim restitution does not constitute increased punishment for a crime and therefore does not trigger the right to a jury trial.

Despite the tide of authority against him, Cota argues that the trial court violated *Apprendi*/*Blakely*/*Southern Union* by issuing victim restitution orders that increased his penalty beyond the statutory maximum. In essence, Cota asks us to swim against the tide. We decline. In our view, the federal and homegrown cases declining to apply *Apprendi* to restitution hearings were properly decided.

## DISPOSITION

The judgments are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J.
               ASHMANN-GERST

We concur:

_____, P. J.
        BOREN

_____, J.[*]
        FERNS

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.