In the

# United States Court of Appeals

## For the Seventh Circuit

No. 20-1465

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MANUELA CHAVEZ,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:16-CR-00337(2) — **Ronald A. Guzmán**, *Judge.*

ARGUED APRIL 21, 2021 — DECIDED SEPTEMBER 1, 2021

Before FLAUM, SCUDDER and KIRSCH, *Circuit Judges.*

KIRSCH, *Circuit Judge.* Manuela Chavez and her aunt owned a clothing store on the south side of Chicago where they sold socks and t-shirts out of the front and kilogram quantities of heroin and cocaine out of the back. In 2015, one of their customers started cooperating with federal law enforcement; eventually, Chavez was indicted for conspiracy to distribute and to possess with intent to distribute heroin and distribution of heroin in violation of 21 U.S.C. §§ 846 and

841(a)(1). Chavez proceeded to trial where the cooperator's testimony and videos he had recorded in the store were key pieces of evidence in the government's case. The jury convicted Chavez on both counts, and she was sentenced to 108 months' imprisonment.

Chavez now appeals her conviction and her sentence. She argues that the prosecutor, during the rebuttal portion of closing argument, made a litany of improper statements vouching for the informant's truthfulness, maligning her defense counsel, and inflaming the jury's fears. Those comments, Chavez continues, both individually and collectively deprived her of a fair trial. She also argues that she must be resentenced because the district court relied on inaccurate information in determining her sentence.

We find no reversible error, either at her trial or during sentencing, and therefore affirm.

I

*Background*. This case started with a narcotics investigation of Willie Slater in early 2015. On August 12, 2015, federal investigators surveilling Slater executed a traffic stop, which prompted Slater to realize that he was under federal investigation. Slater met with FBI agents and decided to cooperate to get out in front of the investigation into his actions. He turned over 812 grams of heroin to the agents that he said he had received in Roma III, a clothing store located on the south side of Chicago owned and operated by Manuela Chavez and her aunt (and eventual co-defendant) Rosalinda Perez.

The agents formulated a plan for Slater to record various aspects of his drug transactions at Roma III. Slater ultimately made a total of five recordings for law enforcement. Four of

those recordings captured Slater delivering money to the store—on August 27, September 2, September 10, and September 21, 2015—totaling approximately $73,000 (of government funds). One recording, from August 28, 2015, showed Chavez giving Slater a package of heroin in the back room of Roma III. Generally, law enforcement surveilled Roma III as Slater entered. After each recording, Slater reconvened with agents and gave a brief report of what had occurred.

*The August 27 and 28, 2015 Interactions*. Two of Slater's recordings are particularly relevant to this appeal. On August 27 at Roma III, Slater delivered $12,800 to Perez. Perez complained that Slater's payment was late and that she was concerned about the late payment because her supplier would "have [her] throat" and "put [her] head on a platter." Slater told Perez that he needed to talk about the heroin that he had picked up from Roma III earlier that month, which he referred to as the "twins," and indicated that the kilogram he had purchased was short. Perez responded that she was not sure she would be able to do anything about the missing drugs.

On August 28, investigators arranged for Slater to pick up heroin at Roma III. Equipped again with recording devices, Slater returned to the store. Once there, Perez told Slater to go with "her"—Chavez—to the back office. Chavez and Slater went to the back office, where Chavez pulled out a brick-sized package wrapped in brown paper and tape. Chavez placed the package into a shoe box, covered it with brown paper, and placed the box into a black plastic bag. Chavez and Slater then returned to the front of the store. By that point, Perez had moved to the checkout counter. Slater took a pair of socks off the display near the counter and paid Perez for them, and

Perez put the socks in a different black plastic bag. Slater then left with both black plastic bags.

Following this handoff, Slater reconvened with the agents. Slater told them he had received the drugs from "Lita"—a nickname for Chavez. According to FBI Special Agent Christopher Hedges, Chavez had not come up in the investigation until this August 28 handoff.

*Indictment*. A grand jury charged Perez and Chavez with conspiracy to distribute and to possess with intent to distribute heroin in violation of 21 U.S.C. § 846 and with distribution of heroin in violation of 21 U.S.C. § 841(a)(1). Following various pretrial motions and rulings by the district court, Perez pleaded guilty. Chavez proceeded to trial.

*Trial*. The evidence at trial principally consisted of testimony from law enforcement officers and the informant Slater, as well as the recordings Slater made at Roma III on August 28 depicting the drug transaction and his interaction with Chavez. Chavez argued that the government could not show that she knew what was in the package she gave to Slater on August 28, except through Slater's unreliable testimony. She contended that Slater was lying to appease the government, which had offered him a lenient plea deal in relation to his own extensive drug distribution crimes.

Slater testified that he had been selling drugs since he was 12 years old (he was 41 at the time of trial) and had been convicted of various felonies, including a cannabis conviction in 1994, a firearms conviction in 1996, another cannabis conviction in 2003, and two other narcotics-related convictions in 2004 and 2011. He had been purchasing large quantities of drugs at Roma III from someone named Jose until 2012, when

Jose died. At that point Perez, Jose's girlfriend, became his supplier of kilogram quantities of cocaine and heroin. Chavez worked with Perez to distribute drugs to Slater up until he began cooperating with the FBI. During this time, Slater picked up drugs from them once or twice a week depending on how quickly he could sell his supply. Between 2012 and 2015, Chavez had provided Slater with drugs on four to seven occasions. Slater also stated that Chavez told him on those occasions what drug he was receiving—brown for heroin or white for cocaine. When Slater dropped off money to Chavez, he instructed her to tell Perez how much cash he had given her. He sometimes showed Chavez the actual cash.

Slater next discussed his cooperation with the government. Around the time Slater began cooperating, he had picked up heroin from Roma III and returned to an apartment to unpack it. As he unpacked it, he noticed it was short. Although the timing is unclear from his testimony, Slater said that at that point he decided to cooperate with the FBI and turned the drugs over without taking any himself.

Finally, the government shifted its focus to Slater's plea agreement in his own criminal case. Slater stated that he was testifying pursuant to a plea agreement in his own heroin and cocaine drug trafficking case, in which he had already pleaded guilty but had not yet been sentenced. He stated that as part of that plea agreement, he agreed to testify truthfully in Chavez's trial. Slater additionally testified that he understood the crime to which he had pleaded guilty carried a potential sentence of five to 40 years' imprisonment, that his sentencing guidelines range would be 360 years to life, and that because of his cooperation the government would recommend a ten-year sentence.

On cross-examination, defense counsel impeached Slater on several issues. First, defense counsel directed Slater to his grand jury testimony, in which he stated that he had "never discussed drugs with" Chavez. Counsel pointed out that Slater had testified at trial, however, that at times Chavez would tell him whether he was receiving "brown" or "white." Slater responded that he meant he had never discussed prices of drugs with Chavez. Defense counsel next asked why Slater, although he had met with the government many times to discuss Perez and Chavez during his cooperation, never told the government that he and Chavez discussed "brown" or "white" until shortly before trial. Slater disagreed with this timeline, saying that he had mentioned the terms "brown" or "white" to someone with the FBI but he did not know who he had told. Defense counsel then pointed out that the investigators said that Slater had not raised that point until a few months before trial, and Slater responded that he guessed the agents were wrong.

Defense counsel next focused on Slater's testimony that he had received drugs from Chavez on four to seven occasions. Slater had testified before the grand jury that Chavez had given him drugs four to five times. Counsel also questioned why Slater had not told investigators this during their initial meetings, but Slater did not give a clear response. Counsel similarly pointed out that Slater had testified before the grand jury that he had given Chavez money for drugs on four or five occasions, but then testified at trial that it had been ten occasions. Counsel also emphasized that none of Slater's previous statements, either to investigators or before the grand jury, referenced him showing Chavez any cash.

Defense counsel also discussed Slater's plea agreement, pointing out that Slater had admitted to distributing more than 100 kilograms of heroin and at least 30 kilograms of cocaine. Slater admitted, among other things, that if he received a guidelines range sentence of 30 years, there was a possibility that he might die in prison.

Finally, Slater was cross-examined on the heroin that he had received from Roma III shortly before he began cooperating, which he had told agents (according to FBI testimony) was short by roughly 200 grams. Defense counsel implied that Slater had stolen the 200 grams as one final score before cooperating, which Slater denied. Slater stated that he did not recall what he had told the FBI about any conversation with Perez regarding the allegedly shorted heroin.

Following the conclusion of testimony, the government, in its initial closing argument, focused heavily on Slater's testimony, the video evidence depicting Chavez handing Slater the package, and the type and quantity of the drugs that were recovered. The prosecutor argued that these aspects of the case proved that Chavez did know what was in the package she was handing Slater. Specifically, the prosecutor reminded the jury that Slater testified that Chavez had told him whether he was getting "brown" or "white." The video of the August 28 transaction was played again, and the prosecutor urged the jury to use their common sense as they watched Chavez's actions, which the prosecutor argued showed that she knew what was going on as she took him into the back room of the clothing store.

Finally, the prosecutor made the following statement before concluding:

> Now, the judge just reminded you that what the parties say in their arguments is not evidence. But we need to talk about this idea that the defendant didn't know that it was a kilo of heroin wrapped in tape. That it didn't even register with her as something that was noteworthy.

The prosecutor then repeated some of the circumstantial evidence discussed above that pointed toward Chavez's knowledge. She specifically focused on the appearance of the package that Chavez had placed into the shoe box. She described it as a "mysterious brick-like package" in an old woman's shoe box, stating this "was not gift wrapping." The prosecutor then asked the jury to find Chavez guilty on both counts.

Next, Chavez's attorney argued. Defense counsel forcefully challenged Slater's credibility, starting with the impeaching evidence he adduced during cross-examination, including Slater's wavering on the number of times cash or drugs had changed hands between him and Chavez. Defense counsel argued that other than Slater's testimony, nothing showed that Chavez knew what was in the package. Counsel then argued that Slater was lying to make the government happy, and that the explanation for his inconsistencies was that he had told so many lies that he was having a hard time keeping them straight in his head. Counsel additionally argued that Chavez's actions could be explained by her trust in her aunt and business partner, Perez. Defense counsel concluded by urging the jury not to convict Chavez based on the Slater's word alone.

Next came the government's rebuttal, which is the primary focus of this appeal. The government began by

reiterating its initial arguments before making arguments about Slater's credibility that generally fall within three categories—explanations for his inconsistencies, his motivation to tell the truth, and immaterial details that were defense counsel's focus.

As for Slater's inconsistencies, the prosecutor argued that "[e]very time Willie Slater has been asked about" Chavez's involvement in the distribution of heroin at Roma III, "he has said the same thing: [Chavez] distributed drugs to me on multiple occasions before August 28, 2015." Defense counsel then objected. The court overruled the objection, but reminded the jury of its initial instructions to them that "if anything the attorneys say conflicts with what they recollect the evidence to be, they are to rely on their own recollection." Following the objection, the prosecutor argued that Slater was "doing his best" to tell the truth, but that certain details may have become mixed up in his mind because these events had happened years before and Slater had been involved with purchasing drugs on many occasions. In effect, the prosecutor argued that it was difficult for Slater to recall exact numbers because this was simply his normal routine as a drug dealer.

Next, the prosecutor emphasized Slater's cooperation:

> I don't know if you've noticed, there is a lot of crime in Chicago. Okay? And the FBI was using [] Slater to try to stop that crime.
>
> …
>
> [W]hat incentive does Slater have to lie to you? You heard about all the different things that he did as part of his cooperation outside of this. Okay? This was a small part of it. You heard

about that. And all the things that [Slater] did, he built up a considerable amount of credit with the government.

…

[Slater] has built up all this credit over all these months, and they like to talk about how many times he met with the agents. He did. He put in a lot of work against a lot of different people.

The prosecutor also argued that Slater had no incentive to lie in this case, as he would risk losing his plea agreement:

[Slater] was looking at 30 to life and now he is looking at 5 to 10. Would he risk all of that, all the work he had done against so many other people out there to frame an innocent person? Does that make sense? He has every motivation in the world to tell you the truth, to tell you the facts and get off the witness stand without jeopardizing his plea agreement, without going to jail for 30 to life. Nothing to gain by framing her, everything to lose.

…

[Slater] is self-interested. He doesn't want to go to jail for the rest of his life. And if he had gotten on the witness stand and told you, you know what, I got it wrong, Perez—the defendant is really the head of the whole operation. Yoink. Plea agreement is gone, he is in prison for the rest of his life. If he gets up and says, it wasn't four to seven times, I got drugs from her 15 or 20 times. Goodbye. You're in prison for the rest of your

> life. Do you think he would risk that? Does the difference between four and five and four to seven, was that someone who is trying to exaggerate and risk going to prison for the rest of his life? Doesn't make sense.
>
> [Slater] is telling you the truth, he is not exaggerating because he doesn't want to go to jail for the rest of his life.
>
> …
>
> [Slater] is not here to exaggerate. He is not here to tell stories. He is here to tell the truth and get off the witness stand so he doesn't go to prison for the rest of his life.
>
> …
>
> No exaggeration. No lying. Not taking an opportunity to implicate her further because [Slater] doesn't want to go to prison for the rest of his life to frame an innocent person.

Finally, the prosecutor made several references to the defense attorney and what he had said during closing argument and the trial:

> Now, let's start with Willie Slater because that's all the defense wants to talk about. Well, let's talk about Willie Slater. Let's talk about it real [sic]. Let's not parse his words, like attorneys like to do.
>
> …
>
> Now, do you remember when Agent Hedges was on the stand and the defense tried to

impeach him with a little parsing of words that defense attorneys love to do. They tried to impeach him on the fact that, after Slater made his second recording and delivered the video to the agents, they tried to suggest to you that he tried to lie to the agents about what he said to Perez on the video, after he had handed the video to the agent so they could watch it. Just because he didn't use the exact words on the tape. That's parsing. That's something defense attorneys do. Don't be distracted by it.

…

But remember when I got back up and tried to tell you about what really mattered about that recording that he told agents the minute he got back? … Do you remember what he did? He jumps up. Whoa, I don't want the jury to hear that. We don't want them to hear that. Why? Because that's a problem for the defense.

…

So then the evidence came in that, when Slater spoke about it, he consistently told agents that she distributed drugs to him. That's a problem for the defense. So what do they do next? They start word-parsing.

…

So let's talk about the things that matter, the things that the human mind holds onto when you're remembering things, and not the little

details. The distinctions without a difference that defense attorneys make their living on.

Chavez objected to the final line, and the district court sustained the objection.

Following arguments, the case was submitted to the jury. During deliberations, the jury sent a note to the court indicating that because Chavez had heard the jurors' names and where they lived, they were concerned for their safety. After conferring with counsel, the district court sent back a note stating that the jurors should not be influenced by fear and that the court would address any concerns the jurors still had after they had performed their duty in accordance with the jury instructions. The jury ultimately returned a verdict of guilty on both counts.

*Sentencing*. At sentencing, the district court stated that it was "very concerned" that Chavez had chosen to "subsidize [her] lifestyle" by selling drugs and that her involvement in the conspiracy did not stem from the need to feed her family or desperation. The district court described this as "truly criminal." Defense counsel objected at this point, stating that the Presentence Investigation Report ("PSR") did not support this conclusion and arguing that there was no evidence in the record that suggested Chavez had financially benefitted from the crime. The district court stated:

> Very well. Well, I think it's very clear that there was a benefit to the two owners of that establishment; that the establishment was made much more productive by the sale of large amounts of narcotics for many, many years. And although it is possible that the defendant

never benefited a penny from that, it is not the
most reasonable inference to be drawn from the
facts. The most reasonable inference is that as
part owner of the store, she was also part of the
transactions going on in the back room, which
she also helped on occasion, apparently when-
ever it was needed.

The court then sentenced Chavez to 108 months' impris-
onment, which was the low end of the guideline range. In its
written statement of reasons, the district court, in part, wrote:

[Chavez] was one-half owner of a retail clothing
boutique and apparently had the means of mak-
ing a living without resorting to selling heroin
and cocaine. This was not a crime driven by des-
pair or need, but a deliberate choice. The need
for deterrence in the general sense as to others
who would, while employed and being far from
destitute, nevertheless choose to engage in drug
trafficking—is also a basis for the court's sen-
tence in this case.

## II

Chavez raises three arguments on appeal. First, she asserts
that she was deprived of a fair trial because of improper pros-
ecutorial statements made during closing argument. Second,
Chavez argues that the prosecution violated the Fifth Amend-
ment protection against self-incrimination by suggesting that
only Chavez could have provided evidence to show she did
not know heroin was in the package she gave Slater on August
28. Third, Chavez contends that the district court relied upon
a fact at sentencing—that Chavez financially benefitted from

the sale of narcotics at Roma III—that was not in the record. We address each argument in turn.

## A

Chavez focuses first on the prosecution's statements in rebuttal. Before raising her argument in this appeal, Chavez moved for a new trial based on three of those statements: (1) that Chavez's attorney "unfairly parses statements like defense lawyers are paid to do"; (2) that if Slater testified untruthfully, the prosecutor "would have yanked him off the stand immediately"; and (3) that Slater "bought firearms from a lot of different people." Chavez did not object at trial to those statements, and the district court denied Chavez's motion. Now on appeal, Chavez identifies those three statements, two other statements to which she objected at trial, and a litany of other unobjected-to statements that she asserts were improper, any or all of which led to an unfair trial.[1]

We review the district court's decision on Chavez's motion for a new trial for abuse of discretion. See *United States v. Rosario*, 5 F.4th 706, 710 (7th Cir. 2021). And we reverse if "no reasonable person could take the view adopted by the trial court[,]" *United States v. Bebris*, 4 F.4th 551, 559 (7th Cir. 2021) (quotations omitted), or if the district court made a legal error. *Rosario*, 5 F.4th at 710.

---

[1] Chavez appealed "from the [district court's] final judgment entered in this action on March 6, 2020." Her notice encompasses "all matters occurring on or before the date of final judgment." *United States v. Bonk*, 967 F.3d 643, 648 (7th Cir. 2020); see FED. R. APP. P. 3(c)(1)(B). Before the district court's entry of judgment, Chavez moved for a new trial and the district court denied that motion. So Chavez's new trial motion is properly before us.

We review the statements to which Chavez failed to object at trial for plain error, reversing "only if we find an obvious (i.e., 'plain') error that affected the outcome of the trial and seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Klemis*, 859 F.3d 436, 441 (7th Cir. 2017). "The challenged remarks cannot be plain error unless [the defendant] probably would have been acquitted if the prosecutor had not made them." *United States v. Norwood*, 982 F.3d 1032, 1053 (7th Cir. 2020) (quotation omitted).

Chavez objected to two statements in the prosecution's rebuttal; the district judge sustained one and overruled the other. We review for abuse of discretion a district court's "decision to overrule an objection to comments in a closing argument." *United States v. Lopez*, 870 F.3d 573, 579 (7th Cir. 2017). The parties do not suggest how we should review an objection the district court *sustained*. We have implicitly suggested that any contemporaneous objection made to a remark in closing argument is reviewed for abuse of discretion. See *United States v. Roe*, 210 F.3d 741, 746–48 (7th Cir. 2000). Because the parties have not argued otherwise, we assume *Roe* provides the correct standard of review concerning Chavez's sustained objection in closing.[2]

We analyze the propriety of a prosecutor's remarks in two steps, asking (1) "whether the prosecutor's comments were improper standing alone," and if improper, (2) "whether the remarks in the context of the whole record denied the defendant[] the right to a fair trial." *United States v. Kelerchian*, 937

---

[2] Even if we reviewed this statement de novo, the outcome would be the same.

F.3d 895, 916 (7th Cir. 2019). Improper prosecutorial state-ments during closing argument "rarely constitute reversible error[,]" and Chavez faces an "uphill battle." *Klemis*, 859 F.3d at 442.

Generally, the statements Chavez challenges fall into three categories. First, Chavez asserts that the prosecutor improp-erly vouched for Slater's credibility. Second, Chavez argues that the prosecutor impugned the defense attorney and de-fense attorneys generally. Third, Chavez contends that the prosecutor inflamed the jury's passions. Additionally, Chavez argues that the cumulative effect of these statements created a reversible error. We address each category in turn.

1

Chavez asserts that the prosecutor vouched for Slater's credibility in a variety of ways: (i) by mentioning facts regard-ing his cooperation that were not in the record; (ii) by insisting that his testimony was consistent on points vital to the prose-cution's case; (iii) by personally approving his credibility; and (iv) by wrongly implying that he had to testify truthfully or risk life imprisonment.

It is well established that "a prosecutor may not express her personal belief in the truthfulness of a witness, and a pros-ecutor may not imply that facts not before the jury lend a wit-ness credibility." *United States v. Wolfe*, 701 F.3d 1206, 1212 (7th Cir. 2012) (quotation omitted). But a prosecutor may com-ment on a witness's credibility so long as the statement "re-flects reasonable inferences from the evidence" rather than a personal opinion of the prosecutor. *Id.* (quotation omitted). A prosecutor may also remind "the jury of evidence presented at the trial that tends to show that a witness was telling the

truth" or "point out that its witnesses, under their plea agreements, are required to testify truthfully." *United States v. Briseno*, 843 F.3d 264, 272 (7th Cir. 2016) (quotations omitted).

i

Chavez argues that the prosecutor's references to Slater's cooperation in other cases—that Slater "put in a lot of work against a lot of different people," that Slater "bought drugs from many, many, different people" and "bought firearms from a lot of different people," and that the FBI used Slater "to try to stop" crime in Chicago—strayed from facts in the record. Chavez makes the same argument with respect to the prosecution's statements that Slater "built up a considerable amount of credit with the government" and, similarly, that Slater "built up all this credit over all these months." Chavez raised the comment concerning firearms in her motion for a new trial, but no others. And Chavez did not object to any of the remarks at trial.

None of these comments was improper. Slater testified both that he wore recording devices to purchase drugs from six other people and that he bought guns as part of cooperating with the government. It was reasonable for the prosecutor to argue from this testimony that Slater's efforts were intended to stop crime, however unlikely that may have been. It was up to the jury to accept or reject this inference. As for the comments about "credit," Chavez concedes that the prosecutor was discussing Slater's potential sentence reduction based on his plea agreement. Thus understood, the prosecutor's remarks are reasonable references to Slater's incentive to testify truthfully. See *Briseno*, 843 F.3d at 272. Indeed, those incentives—stemming from Slater's plea agreement—were brought out on direct and cross-examination in great detail.

And all the comments Chavez identifies are grounded in evidence. See *Wolfe*, 701 F.3d at 1212. So we reject Chavez's arguments concerning this group of statements.

ii

Chavez next contends that the prosecution insisted—improperly—Slater's testimony was consistent, thus bolstering Slater's credibility. In support, Chavez highlights several statements to which she did not object: that Slater "consistently told the government that [Chavez] distributed narcotics to him on multiple occasions"; that "every time" Slater "spoke about" the drug sales he was "consistent"; that Slater's testimony about the conspiracy was "thoroughly corroborated on video"; that Slater "is telling [the jury] the truth"; that Slater was "not here to exaggerate"; and that Slater was "always consistent on everything that matters" twice repeating the word "consistent." And Chavez also raises the statement to which she objected at trial that "[e]very time Slater" was asked about Chavez's multiple distributions of heroin, Slater "has said the same thing." Chavez did not include any of these statements in her motion for a new trial.

We are not convinced that any of the remarks Chavez identifies crossed the line (although at least one appears to come right up to it). We are most troubled by the prosecutor's comment to the jury that Slater was "telling you the truth." If we were to read that statement without the context of the immediate subsequent remarks, it would be vouching (expressing a personal belief in a witness's truthfulness). See *Wolfe*, 701 F.3d at 1212. But when this comment is viewed alongside the prosecutor's remarks directly following it and put in context, we cannot say that it warrants a new trial. When the remarks are read together, the prosecutor was suggesting that the jury

could infer Slater was telling the truth because he had sufficient motivation for doing so. There is a fine line between a prosecutor baldly saying, "Witness is telling the truth," and saying something like, "You can conclude from the evidence that witness is telling the truth because he has a strong motivation to do so." See *Kelerchian*, 937 F.3d at 918 ("[W]e have noted that lawyers sometimes are not as precise as they should be when giving extemporaneous closing arguments." (quotation and alteration omitted)). But it is a line that prosecutors should take care not to cross. There is another reason that reversal here is unwarranted—defense counsel never objected to the comment at trial. Had counsel objected, the district court could have sustained the objection, struck the comment, and instructed the jury to disregard it. Further, the prosecutor could have taken the opportunity to clean up the statement and explain to the jury that credibility determinations were theirs to make, while also explaining how and why the jury could conclude from the evidence that Slater was telling the truth. Perhaps counsel did not object for strategic reasons—counsel may have believed that Chavez was better off with the prosecutor focusing on Slater's credibility than the video of Chavez handing Slater a kilogram of heroin. We do not know, and it does not matter here. The prosecutor's comment does not warrant a new trial.

As to the other statements regarding the consistency of Slater's testimony, Chavez admits that "some" might be "technically true"; tellingly, she does not identify those that perhaps are not. These comments merely emphasize the consistent thread in Slater's testimony—that Chavez gave Slater drugs more than once. That thread finds support in Slater's statements to investigators, his grand jury testimony brought out in cross-examination, and his trial testimony. The jury

could have rejected this argument that Slater's testimony was consistent based on certain inconsistencies in his testimony, as defense counsel ably urged them to do. But that does not render the statements improper bolstering, and the statements' foundation in the evidence assures us, too, that each passes muster.

iii

Chavez suggests that the prosecution offered the jury its approval of Slater's credibility. Specifically, Chavez points to the statement that Slater "is someone who is doing his best to tell you the truth," and that if Slater lied while testifying, the government would take him off the witness stand—in the prosecution's words, "Yoink"—and Slater would go to "prison for the rest of his life." At trial, Chavez did not object to these statements. And she raised only the "yoink" statement in her motion for a new trial.

Again, we find nothing improper in the prosecutor's remarks. Fatal to both is that neither comment evidences the prosecutor expressing a *personal* opinion. See *Wolfe*, 701 F.3d at 1212. The "doing his best" comment was an explanation for any inconsistencies in Slater's testimony and, as discussed, the prosecution may reference a witness's obligation under a plea agreement to tell the truth. As for the "yoink" comment, it was not a literal description of what the prosecutor might do (i.e., drag Slater off the stand) should Slater testify untruthfully, but rather a colorful description of the consequences under the plea agreement for untruthful testimony. Because neither comment invokes the prosecutor's personal opinion, we reject Chavez's arguments concerning these remarks.

iv

Chavez contends that the prosecution implied Slater's testimony was premised upon a choice between honesty and life imprisonment. Chavez identifies several of the prosecution's comments in support: stating if Slater testified that he got drugs from Chavez 15 to 20 times instead of 4 to 7 times, he would be "in prison for the rest of [his] life; asking whether "the difference between four and five and four to seven, was that someone who is trying to exaggerate and risk going to prison for the rest of his life?"; stating Slater "is not exaggerating because he does not want to go to jail for the rest of his life"; that Slater "doesn't want to go to prison for the rest of his life"; and that Slater "doesn't want to go to prison for the rest of his life to frame an innocent person." She neither objected to these statements nor raised them in her motion for a new trial.

We reject Chavez's argument. Slater testified that, without his plea agreement, his guideline range would be 360 months' to life imprisonment. Slater, then, indeed could have been sentenced to the top end of the guideline range, and the prosecutor's argument (however unlikely we believe it to be) was grounded in the evidence adduced at trial. Moreover, defense counsel on cross-examination ably made the point that even a minimum guideline sentence of 30 years could be a life sentence given Slater's age. And, as discussed, it is proper for the prosecutor to discuss Slater's obligation under the plea agreement to testify truthfully. See *Briseno*, 843 F.3d at 272.

2

We next turn to the prosecutor's statements referencing defense attorneys. As discussed, Chavez objected to one of

those statements—referencing the "distinctions without a difference" defense attorneys "make their living on"—which the district court sustained. She also raised another statement—noting that defense attorneys are paid to parse witness statements—in her motion for new trial, which the district court held was not improper or, alternatively, did not deprive Chavez of a fair trial.

The government may criticize defense tactics, but not defense counsel. *United States v. Bloom*, 846 F.3d 243, 254 (7th Cir. 2017). Here, most of the prosecutor's statements referencing defense counsel, including those Chavez objected to and raised in her new trial motion, address tactics—parsing testimony of witnesses and drawing distinctions that do not matter—not counsel.

But we are troubled by two remarks. First, the government should not have encouraged the jury to draw a negative inference from defense counsel's objection during trial. The government rightly does not argue otherwise on appeal. At the same time, however, the remark did not change the outcome of the trial. The hearsay objection to which the prosecutor alluded in closing concerned one case agent's testimony about what Slater related to the agent of his relationship with Chavez. Slater testified, thoroughly, about this relationship, and the video evidence corroborated parts of his testimony. So the jury was well aware of Slater's relationship with Chavez regardless of whether the prosecutor improperly focused its attention on a defense objection concerning the same.

Second, the prosecutor should not have expressed a view of how defense counsel makes its living. Again, however, we are not persuaded that the district court abused its discretion

either in how it handled Chavez's objection at trial or in how it addressed the comment in her motion for a new trial. Indeed, at trial, the district court sustained Chavez's objection to this comment, and instructed the jury that the parties' arguments were not evidence. In its order on Chavez's motion for a new trial, the district court held that these statements did not deprive Chavez of a fair trial because they were not outrageous or extreme and the jury was instructed that the attorneys' arguments were not evidence. That conclusion was reasonable. So the district court, which had the benefit of observing the trial and was in the best position to assess the impact of this statement, did not abuse its discretion.

3

Chavez next asserts that the prosecution improperly inflamed the passions of the jury—as evidenced by a jury note questioning jurors' safety—by referencing guns, by emphasizing Perez's statement about her drug source having her "head on a platter" if she was late with payment, and by mentioning crime on the south side of Chicago generally. None of these statements drew an objection, and Chavez did not include them in her motion for a new trial.

It is well established that a prosecutor may not make an argument "aimed at inflaming the passions of the jury." *United States v. Jackson*, 898 F.3d 760, 765 (7th Cir. 2018). Not so here. Each statement Chavez identifies had a firm foundation in the record. Moreover, the prosecutor made the statements in the context of arguments drawing permissible inferences from that record evidence. As for the jury note, Chavez's argument is speculative. So, in sum, the statements were not improper, much less plainly erroneous.

4

Chavez concludes by insisting that the cumulative effect of the errors she identifies above denied her a fair trial. "Cumulative errors, while individually harmless, when taken together can prejudice a defendant as much as a single reversible error and violate a defendant's right to due process of law." *United States v. Marchan*, 935 F.3d 540, 549 (7th Cir. 2019) (quotation omitted). To demonstrate cumulative error, Chavez must show that (1) "at least two errors were committed in the course of the trial," and (2) "considered together along with the entire record, the multiple errors so infected the jury's deliberation that they denied the petitioner a fundamentally fair trial." *Id.* (quotations omitted). For the reasons discussed above, Chavez fails to establish an error in the prosecution's rebuttal argument.

From our review of the record, defense counsel represented Chavez well during trial, highlighting the key dispute in the case—whether Chavez knew that drugs were in the package she handed to Slater. To that end, defense counsel ably made the jury aware, in detail, of Slater's inconsistencies and suspicious changes in story. Moreover, the district court specifically instructed the jury that they "may give Slater's testimony whatever weight you believe is appropriate, keeping in mind that you must consider that testimony with caution and great care." In any event, we are not convinced that Slater's testimony alone served as the basis for inferring Chavez's knowledge of the drug distribution, or that Slater's testimony concerning her knowledge was uncorroborated. The video evidence showed familiarity between Chavez and Slater and illustrated Chavez's understanding of where to find the drugs in the back room and how to conceal them. The

jurors could draw inferences about whether that interaction, which occurred in a back room of a clothing store and involved a package which did not clearly appear to contain clothing, corroborated other aspects of Slater's testimony.

B

Chavez next argues that the government indirectly highlighted her decision not to testify in violation of the Fifth Amendment. Chavez did not object to the statement underlying this challenge, so we review for plain error. *United States v. Phillips*, 745 F.3d 829, 833–34 (7th Cir. 2014).

During the government's initial closing argument, the prosecutor said:

> Now, the judge just reminded you that what the
> parties say in their arguments is not evidence.
> But we need to talk about this idea that the de-
> fendant didn't know that it was a kilo of heroin
> wrapped in tape. That it didn't even register
> with her as something that was noteworthy.

The Fifth Amendment's protection against self-incrimination bars a prosecutor from "offer[ing] a defendant's failure to testify as substantive evidence of guilt, whether directly or indirectly." *United States v. Willis*, 523 F.3d 762, 773 (7th Cir. 2008) (quotation omitted). Indirect comments are improper "only if the prosecutor's manifest intent was to use the defendant's silence as evidence of guilt, or if the jury would naturally and necessarily infer guilt from the comment." *United States v. Carswell*, 996 F.3d 785, 797 (7th Cir. 2021) (quotations omitted).

The prosecution's comments here did not cross the line. True, the case hinged on whether Chavez knew what was in

the package she gave to Slater. But context demonstrates the prosecutor did not intend to use Chavez's silence to prove her guilt, and no jury would naturally infer Chavez's guilt from the comment. Instead, the statement prefaced the remarks following it about evidence that showed Chavez did know what was in the package, an essential element of the crime charged. The prosecutor discussed the familiarity that Chavez displayed to Slater when he entered the store, how she did not hesitate to take him into the store's back room to retrieve the brick-shaped package, and how she further concealed the package in an old shoe box before bringing it, and Slater, back to the store's front room. These are simply arguments based on the circumstantial evidence that was adduced at trial, from which it was proper for the government to argue Chavez's knowledge.

C

Chavez's final argument addresses sentencing. Chavez asserts that the district court relied on inaccurate information when it found that Chavez had "subsidized her lifestyle" with money connected to the drug distribution conspiracy. And because the district court emphasized that this fact was an aggravating circumstance at sentencing, Chavez insists the district court's reliance upon it affected her sentence.

Chavez has "a due process right to be sentenced based on accurate information." *United States v. Pennington*, 908 F.3d 234, 239 (7th Cir. 2018). A district court procedurally errs when it relies upon inaccurate information at sentencing. We review arguments asserting procedural errors de novo. *Id.* at 238. To succeed on her challenge, Chavez must show that "inaccurate information was before the court and that the court relied upon it." *Id.* at 239.

As a preliminary matter, we are not convinced the district court relied on inaccurate information when it explained its reasons for Chavez's sentence in open court. As discussed, the district court initially stated that it was troubled that Chavez had supplemented her lifestyle by selling drugs. But when defense counsel pointed out that the court's view was not supported by the PSR, the court appears to have changed course, stating that "the most reasonable inference" to be drawn from the facts was that Chavez benefited to some degree from the drug sales. This is a logical conclusion based on the evidence.

But we need not resolve that issue because the district court clarified its reasoning in its written statement of reasons. In its written statement, the court clarified that the aggravating factor upon which it relied at sentencing was Chavez's lack of economic need to commit the crime. That statement is consistent with the findings in the PSR. So even if the district court's oral explanation for Chavez's sentence was based, in part, on inaccurate information, the district court properly "corrected his oral misstatement of the facts" in his written explanation. *Pennington*, 908 F.3d at 240.

AFFIRMED